# United States Court of Appeals
## For the First Circuit

No. 09-2386

JUAN LOPERA, ET AL.,

Plaintiffs, Appellants,

v.

TOWN OF COVENTRY, ET AL.,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

[Hon William E. Smith, U.S. District Judge]

Before

Lynch, Chief Judge,
Selya and Thompson, Circuit Judges.

Stephen M. Robinson, with whom Vicki J. Bejma and Robinson & Calpham were on brief, for appellants.
Thomas R. Bender, and Hanson Curran LLP, were on brief for Rhode Island Affiliate, American Civil Liberties Union, amicus curiae.
Marc DeSisto for appellees.

April 1, 2011

**LYNCH, <u>Chief Judge</u>.**  Former members of the Central Falls High School boys soccer team appeal from an entry of summary judgment for the Town of Coventry, Rhode Island, and Coventry police officers in this civil rights case.  This dispute arises out of a police search of team members that followed a heated soccer match between Central Falls High School and Coventry High School in Coventry in 2006.  Police searched all individual Central Falls team members for items purportedly missing from the Coventry locker room in the presence of an abusive crowd of Coventry students and adults.  Though the Central Falls coach told the police he consented to the search of his players, both he and the players assert that he was coerced into doing so by the police.

Lead plaintiff Juan Lopera and other former members of the Central Falls team brought suit for damages and injunctive relief in April 2008, alleging violations of their constitutional rights under the Fourth and Fourteenth Amendments, as well as violations of Rhode Island state law.  The defendant police officers asserted a defense of qualified immunity.  The district court held that the players failed to raise a genuine issue of material fact as to whether (1) the police officers were not entitled to qualified immunity with respect to their claims under the Fourth Amendment and state privacy law, or (2) the police had engaged in racial discrimination in violation of the Equal Protection Clause or Rhode Island statutes prohibiting racial

-2-

profiling and intimidation.  Lopera v. Town of Coventry, 652 F. Supp. 2d 203, 213-17 (D.R.I. 2009).  We affirm.

                                        I.

    We review the facts in the light most favorable to Lopera and the other plaintiffs, the parties opposing summary judgment. On September 28, 2006, the Central Falls High School soccer team traveled to Coventry for a match against Coventry High School. Before the game, four or five Central Falls players used the restrooms in the Coventry locker room.  They were not alone.  A security guard accompanied the boys into the locker room.  The locker room is usually open and unlocked and could be easily accessed, including by unauthorized persons.

    The locker room is apparently used by all Coventry teams and recently had been used by Coventry's football team.  After the soccer match, a group of approximately twenty football players[1] confronted the Central Falls coach, Robert Marchand, as he walked behind his players toward the team bus.  In profane terms, the Coventry students accused the Central Falls players of stealing iPods and cell phones from the Coventry locker room.

    The Central Falls players allege that they encountered hostile racism during their match with the Coventry soccer team and during the remainder of their time in Coventry.  Central Falls is a racially diverse community, and the Central Falls team consisted

_____

    [1]    This crowd apparently did not include any soccer players.

-3-

entirely of Spanish-speaking Hispanic players, save for one Portuguese player. Coventry, by contrast, is predominantly non-Hispanic and white, and its high school reflected this. The Central Falls players allege that Coventry players uttered racial epithets during the game, calling them "spics" and demanding that they speak English. They allege that Coventry students and adults made similar remarks during the series of events that followed the game.

After the Coventry football players confronted Coach Marchand with the purported thefts, he told them that he would handle the situation. The football players followed him toward the Central Falls bus. Before the group reached the bus, Coach Marchand told the players to wait. Coach Marchand then boarded the bus, where his team was waiting. Coach Marchand informed the players of the accusations and told them that he knew they had not taken the items. Nonetheless, he and an assistant coach searched the players' bags. If an iPod or cell phone was found, Coach Marchand asked for proof that it belonged to the player. The search lasted approximately twenty to twenty-five minutes. Coach Marchand testified that when it was completed, he was "completely satisfied" that his players did not possess the items.

After he completed the search, Coach Marchand left the bus to speak with the Coventry Athletic Director, who was waiting outside. By this time, Coach Marchand testified, a crowd of fifty

or sixty Coventry students and adults had gathered around the bus. According to Coach Marchand, members of the crowd yelled that they knew his players had the items. He testified that students and adults in the crowd stated that the players were "from the ghetto," knew how to "hide things" and "lie good," and could not be trusted. The players recounted similar accusations and vitriol, including racial slurs like "spic." At one point, a member of the crowd apparently tried to board the bus to conduct his own search. Coach Marchand testified that members of the crowd demanded a search of his own bags. He also testified that members of the crowd stated that they would not let the Central Falls players leave until the items had been found.

Coach Marchand told the Coventry Athletic Director that he had checked "everything" on the bus, and that his players did not have the purportedly missing items. Coach Marchand also told the Athletic Director that he was welcome to do his own search, which the Athletic Director declined as unnecessary. Coach Marchand testified that as he and the Athletic Director puzzled over how to "satisfy all [the] constituencies here," he began to worry that violence might ensue.

At this point, three or four Coventry police cruisers arrived on the scene with their lights and sirens activated. The police had received calls reporting a supposed ongoing physical altercation. The officers boxed in the Central Falls bus with

-5-

their cruisers so that it could not move. According to the players, by this time the crowd had also formed a semi-circle around the bus, blocking its path out of the parking lot.

Once it became clear that no physical altercation was taking place, the police discussed the situation with Coach Marchand and the Coventry Athletic Director. Coach Marchand explained to the officers that the Coventry students had alleged thefts and that his players "were prime suspects." He told the officers that he had searched each student's bags on the bus and did not find the purportedly missing items. Coach Marchand expressed fear of the crowd, asking the police, "what am I going to do, what are they going to do to us[?]" After a pause, Coach Marchand testified, the police responded by asking him if they could search the players. Coach Marchand verbally agreed.

Coach Marchand did not testify that the officers said or did anything coercive. Coach Marchand testified that the officers acted courteously and told unruly members of the crowd to be quiet. According to Coach Marchand, the police "decided their best thing was to [do the] search themselves to appease the masses" who were "crying for our heads." In his testimony, he described his consent as the way to "take the high road, take the safe road," even though he knew his players did not have the items. We must take this

testimony as true on this motion for summary judgment.[2]  The police testified that the crowd was angry and unruly, consistent with the players' testimony.  They also testified that they did not hear any racial epithets from members of the crowd, which is not the plaintiffs' testimony.

After agreeing to the search, Coach Marchand returned to the bus and told his players that the crowd would not let them go until the police searched them.  The police then told the players to get off the bus with all of their belongings and line up with their bags between their legs.  The players complied, lining up with their backs against the bus.  An officer then told the players that if any of them had the missing items, they would be arrested if they did not immediately step forward.  When none of the players stepped forward, the officers began a search.  Coach Marchand testified that the officers placed each player's bag on the hood of a cruiser and looked through it.  A few players testified that some players were also subjected to pat down searches.  During the search, the crowd was about six to ten feet away from the players.

The search lasted for about 45 minutes to an hour.  The police officers testified that they did not obtain descriptions of the type of iPods or cell phones alleged to be missing, other than

_____

[2]    One officer testified that Coach Marchand suggested the search and that they conducted the search because it would "expedite the process and eliminate them all as suspects."  These are disputed facts and for these purposes we do not accept them.

that one phone may have been a "flip phone." When the police located an iPod or a cell phone on a player, they required that the player prove that the item belonged to him. In some cases, the players identified items stored on the devices and allowed the officers to search the devices. In other cases, the officers displayed the devices to members of the crowd and asked if they were the missing devices. During the course of the search, members of the crowd alleged that additional items were missing, like books and money.

The players testified that the crowd continued to harass them during the search. One player testified that, during the search, members of the crowd called the players "spics." Another testified that members of the crowd stated that the Central Falls team should not be in Coventry or playing Coventry High School given the race of its players. Members of the crowd photographed the Central Falls students during the search with their cell phone cameras. Marchand testified that although the officers reprimanded unruly members of the crowd during the search, they did not take adequate actions to disperse the crowd or move it away from the bus.

There was testimony that during the search, one Coventry officer told one of the players that he thought the search was "stupid" because the coach had already searched the players and because a security guard had accompanied the players in the locker

room. Another officer, hearing the comment, laughed. The police required all the players to wait outside the bus until every player had been searched. The search did not produce any of the missing items. After it was completed, the police escorted the bus out of town in their cruisers.

Lopera and other members of the Central Falls team filed suit in April 2008 against the Town of Coventry and several individual Coventry police officers under 42 U.S.C. § 1983 (§ 1983) and Rhode Island state law. Under § 1983, the players alleged deprivations of their Fourth Amendment right to be free from unreasonable searches and seizures, as well as their Fourteenth Amendment rights to due process of law and equal protection of the law.[3] Under Rhode Island state law, the players alleged violation of statutes that forbid invasion of privacy, racial profiling, and ethnic intimidation. R.I. Gen. Laws § 9-1-28.1; id. § 31-21.2; id. § 9-1-35.

The district court granted summary judgment for the defendants on all counts. First, it held that the officers were entitled to qualified immunity with respect to the Fourth Amendment and state privacy claims because (1) it was not unreasonable for the officers to believe that Coach Marchand had power to consent to the search, and (2) coercion did not vitiate Coach Marchand's

_____

[3] The players have conceded that their Due Process claim was not intended to allege a violation of their substantive due process rights and thus overlaps with their Fourth Amendment claim.

consent. Second, it held that the players did not introduce sufficient evidence to support a finding that the police engaged in racial discrimination in violation of the Equal Protection Clause or Rhode Island's statutes prohibiting racial profiling and ethnic intimidation. The district court also held on independent grounds that the players had not introduced material facts to support their claims of supervisory and municipal liability.

## II.

On appeal, the players make two arguments. First, they argue that the officers were not entitled to qualified immunity for the claims under the Fourth Amendment and state privacy law because (1) a reasonable officer would have believed that Coach Marchand did not have authority to consent for his players, and (2) a reasonable officer would have believed that Coach Marchand's consent was coerced. Second, they argue that they set forth material facts to support the reasonable inference that the actions of the officers were impermissibly motivated by race in violation of the Equal Protection Clause and Rhode Island state law. The players do not challenge the district court's rulings on municipal and supervisory liability.

In their answer to the players' complaint, the defendant officers asserted qualified immunity against all claims. In asserting this defense before the district court and before this court, the officers focused their argument on whether it was

clearly established that Coach Marchand could consent on behalf of his students in loco parentis. The district court analyzed this question in a qualified immunity framework, but it appeared to address the players' remaining claims outside of that framework. Given that the officers have raised a qualified immunity defense to all of the players' claims, we address each of the players' claims in the qualified immunity framework.

This court reviews grants of summary judgment de novo. Saccucci Auto Group, Inc. v. Am. Honda Motor Co., 617 F.3d 14, 20 (1st Cir. 2010). We must make all reasonable inferences in favor of the non-moving party and may reverse only if "the evidence on record 'is sufficiently open-ended to permit a rational factfinder to resolve the issue in favor of either side.'" Maymi v. Puerto Rico Ports Auth., 515 F.3d 20, 25 (1st Cir. 2008) (quoting Nat'l Amusements, Inc. v. Town of Dedham, 43 F.3d 731, 735 (1st Cir. 1995)). This standard of review applies to grants of summary judgment on grounds of qualified immunity. See Kelley v. LaForce, 288 F.3d 1, 4 (1st Cir. 2002). When a defendant moves for summary judgment on the basis of qualified immunity, the plaintiff bears the burden of showing infringement of a federal right. Quintero de Quintero v. Aponte-Roque, 974 F.2d 226, 228 (1st Cir. 1992).

A.      The Doctrine of Qualified Immunity

Qualified immunity "protects government officials 'from liability for civil damages insofar as their conduct does not

-11-

violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Pearson v. Callahan, 129 S. Ct. 808, 815 (2009) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). This circuit follows a two-step analysis under Pearson in discerning whether defendants are entitled to qualified immunity. We ask "(1) whether the facts alleged or shown by the plaintiff make out a violation of a constitutional right; and (2) if so, whether the right was 'clearly established' at the time of the defendant's alleged violation." Maldonado v. Fontanes, 568 F.3d 263, 269 (1st Cir. 2009).

The Supreme Court has held that it is not mandatory for courts to follow this two-step test sequentially. Pearson, 129 S. Ct. at 818-21; see also Maldonado, 568 F.3d at 269-270. A finding that a right was not clearly established at the time of the alleged violation is sufficient to warrant a finding of qualified immunity. See Pearson, 129 S. Ct. at 822. In some cases "discussion of the first prong of the qualified immunity analysis will result 'in a substantial expenditure of scarce judicial resources on difficult questions that have no effect on the outcome of the case.'" Maldonado, 568 F.3d at 270 (quoting Pearson, 129 S. Ct. at 818).

In this case, these considerations counsel that we consider the second prong of the analysis and go no further. That prong, we have held, has two aspects: that both (1) the legal contours of the right in question and (2) the particular factual

-12-

violation in question would have been clear to a reasonable official. Id. at 269. Together, these two factors ask whether a reasonable officer, similarly situated, would have believed that his conduct did not violate the Constitution. Harlow, 457 U.S. at 818-19; Philip v. Cronin, 537 F.3d 26, 34 (1st Cir. 2008).

The qualified immunity defense "is designed to protect 'all but the plainly incompetent or those who knowingly violate the law.'" Morse v. Frederick, 551 U.S. 393, 429 (2007) (quoting Malley v. Briggs, 475 U.S. 335, 341 (1986)). A finding of qualified immunity is warranted if "a reasonable officer could have believed his conduct was lawful." Olmeda v. Ortíz-Quiñonez, 434 F.3d 62, 65 (1st Cir. 2006). Such a finding is not warranted if "no reasonable officer could believe" that his conduct was lawful. Groh v. Ramirez, 540 U.S. 551, 564 (2004). Put another way, immunity will issue when "officers of reasonable competence could disagree" on the lawfulness of an action, but it will not issue if "it is obvious that no reasonably competent officer would have concluded" that the action was lawful. Malley, 475 U.S. at 342.

This is an objective test; it does not look to the defendants' subjective beliefs concerning the unlawfulness of their conduct. Philip, 537 F.3d at 34. A "determination of objective reasonableness," however, "'will often require examination of the information possessed' by the defendant officials." Kelley, 288

F.3d at 7 (quoting Anderson v. Creighton, 483 U.S. 635, 641 (1987)).

This objective test does not establish that "an official action is protected by qualified immunity unless the very action in question has previously been held unlawful." Anderson, 483 U.S. at 640. The Supreme Court has made clear that "officials can still be on notice that their conduct violates established law even in novel factual circumstances." Hope v. Pelzer, 536 U.S. 730, 741 (2002) (citing United States v. Lanier, 520 U.S. 259 (1997)). Nonetheless, unlawfulness must be apparent in light of pre-existing law at the time of the alleged violation. Anderson, 483 U.S. at 640. The content of clearly settled law and the belief of a reasonable officer under the circumstances are questions appropriately addressed by courts before trial, where possible. See Hunter v. Bryant, 502 U.S. 224, 227-28 (1991); Cox v. Hainey, 391 F.3d 25, 29 (1st Cir. 2004).

We divide our discussion in this case between the players' claims under the Fourth Amendment and state privacy law and their claims under the Equal Protection Clause and state laws forbidding racial profiling and ethnic harassment.

B.        Fourth Amendment and State Privacy Claims

In their claims under the Fourth Amendment and the state privacy statute, the players give two grounds to defeat qualified immunity. First, they argue that all officers of reasonable

-14-

competence would have believed that Coach Marchand did not have authority to consent on behalf of the players. Second, they argue that all officers of reasonable competence would have believed that coercion vitiated Coach Marchand's purported consent to the search in this case.

The district court focused primarily on the players' first argument. It held that the players failed to introduce a material fact showing it was clearly established that Coach Marchand could not consent on their behalf under the circumstances. Lopera 652 F. Supp. 2d at 213-16. In so finding, the district court relied on the apparent uncertainty of prevailing Supreme Court doctrine governing in loco parentis searches in schools. Id. As to the players' second argument, the district court held that Coach Marchand's consent was voluntary because he "understood the situation," id. at 216, and gave consent "after careful and deliberate thought," id. at 217. The district court did not address whether this would have been clear to the officers under the circumstances, nor whether it was clearly established that coercion vitiates consent.

1. Coach Marchand's Authority to Consent

We may quickly dispose of the players' first argument, which does not require analysis of the intricacies of the in loco parentis doctrine. Under the facts alleged by the players, a reasonable officer could have concluded that Coach Marchand had

authority to consent to a search of his students. The search did not take place at Central Falls High School, but rather on a trip away from school over which Coach Marchand was undisputedly in charge. When the officers arrived, Coach Marchand told them that he had already conducted his own search of his students. To arrive at the conclusion that Coach Marchand could not consent, an officer would have had to question Coach Marchand's authority to perform the first search and, by extension, Coach Marchand's authority to consent to a second search by the police.

We cannot say that no officer of reasonable competence could have reached the conclusion that Coach Marchand had authority to consent. As the players argue, the Supreme Court has recognized limits on the in loco parentis authority of school officials. New Jersey v. T.L.O., 469 U.S. 325, 336-37 (1985). To defeat a finding of qualified immunity, however, the players must identify authority sufficiently particularized that the unlawfulness of an act would have been apparent to all officers of reasonable competence. Wilson v. Layne, 526 U.S. 603, 615 (1999). Subsequent decisions make clear that T.L.O. has not eliminated a school official's in loco parentis power to consent on behalf of his students. See Vernonia Sch. Dist. 47J v. Acton, 515 U.S. 646, 654-56 (1995). The players do not identify a sufficiently particularized decision of this court or the Supreme Court that places Coach Marchand's consent clearly beyond his authority under the facts they allege.

-16-

## 2. The Validity of Coach Marchand's Consent

The players' second argument concerning the validity of Marchand's consent requires more discussion. There is no dispute that all officers of reasonable competence would have known that coercion vitiates consent to a search under the Fourth Amendment. See United States v. Vanvliet, 542 F.3d 259, 264 (1st Cir. 2008). Under the Fourth Amendment, consent may "not be coerced, by explicit or implicit means, by implied threat or covert force." Schneckloth v. Bustamonte, 412 U.S. 218, 228 (1973). As to the other considerations relevant to the validity of Coach Marchand's consent, we reiterate that we may only deny qualified immunity if "it is obvious that no reasonably competent officer would have concluded" that the action was lawful. Malley, 475 U.S. at 342. If "officers of reasonable competence could disagree" on the lawfulness of an action, we must grant qualified immunity. Id.

We first dispose of a legal question about the scope of the facts to be considered. The officers argue that the law under Schneckloth was not clearly established; they contend that it was the crowd, not the officers, who created any coercive atmosphere and that the coercion must "emanat[e] from the police officers themselves rather than any subjective or outside influence." Citing the Supreme Court's decision in Colorado v. Connelly, 479 U.S. 157 (1986), the officers argue that the examination of coercion must focus solely on the acts of the officials requesting

to perform the search. We reject this argument for two different reasons, but nonetheless find for other reasons that defendants are entitled to qualified immunity.

First, Connelly is not clearly established law limiting Schneckloth. Second, taking the facts in the light most favorable to the plaintiffs, the crowd was not the only source of potential coercion. It is clearly established law under Schneckloth that in considering the validity of consent, all the surrounding circumstances must be considered. Schneckloth, 412 U.S. at 227; Vanvliet, 542 F.3d at 264. Neither the Supreme Court nor this court has extended the rule in Connelly, a decision under the Due Process Clause of the Fourteenth Amendment, to Fourth Amendment consent cases.

In Connelly, the defendant claimed that because he heard a "voice of God" telling him to confess, his confession in police custody was coerced and thus invalid. Connelly, 479 U.S. at 170-171. The Supreme Court held a defendant's mental condition "by itself and apart from its relation to official coercion" cannot "dispose of the inquiry into constitutional 'voluntariness'" under the Fourteenth Amendment's Due Process Clause. Id. at 164. It concluded that "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary'" within the meaning of that clause. Id. at 167. The Court did not address Fourth Amendment searches.

-18-

We are unaware of any published circuit court decision that applies this standard for voluntariness of a confession to questions of consent under the Fourth Amendment. But see United States v. Quezada, No. 91-5004, 1991 WL 191402 (4th Cir. Oct. 24, 1991) (applying Connelly to a Fourth Amendment search in an unpublished decision). At least two circuits have expressly declined to do so. United States v. Montgomery, 621 F.3d 568, 571-72 (6th Cir. 2010); Tukes v. Dugger, 911 F.2d 508, 516 & n.13 (11th Cir. 1990). This circuit has continued to apply the requirements in Schneckloth for consent to a Fourth Amendment search. See Vanvliet, 542 F.3d at 264. Moreover, we are unaware of any lower court decision in this circuit that extends Connelly to Fourth Amendment searches. See Pearson, 129 S. Ct. at 823.

Having rejected the defendants' efforts to narrow the focus of inquiry, we turn to the articulation of the clearly established law. In Schneckloth, the Supreme Court held that coercion must be discerned by examining "all the surrounding circumstances," including "subtly coercive police questions" and "the possibly vulnerable subjective state of the person who consents." Schneckloth, 412 U.S. at 229. In Ohio v. Robinette, 519 U.S. 33 (1996), the Court repeated that "[t]he Fourth Amendment test for a valid consent to search is that the consent be voluntary, and '[v]oluntariness is a question of fact to be

-19-

determined from all the circumstances.'" Id. at 40 (alteration in original) (quoting Schneckloth, 412 U.S. at 248-49).

We have held that voluntariness of consent depends on considerations including, but not limited to, "(i) the consenter's age, education, past experiences, and intelligence; (ii) whether law enforcement officials advised the consenter of his constitutional right to refuse consent; (iii) the length and conditions of the consenter's detention and/or questioning; and (iv) law enforcement officials' use of any inherently coercive tactics." Vanvliet, 542 F.3d at 264 n.2 (citing Schneckloth, 412 U.S. at 226).

A consent is coerced when an individual's "will ha[s] been overborne and his capacity for self-determination critically impaired" such that he does not face an "essentially free and unconstrained choice." United States v. Watson, 423 U.S. 411, 424 (1976) (quoting Schneckloth, 412 U.S. at 225) (internal quotation marks omitted). It is seldom the case that "a single coercive element will, standing alone, be enough to invalidate a consent." W. LaFave, Search and Seizure § 8.2(b), at 62 (4th ed. 2004). An officer's failure to inform an individual of her right to refuse consent to a search does not necessarily render her consent to such a search coerced. See Robinette, 519 U.S. at 39-40. Nor is a consent to a search given in police custody necessarily coerced. Watson, 423 U.S. at 424.

Two Supreme Court cases are particularly instructive here, but are not cited to us by either side. The first is United States v. Drayton, 536 U.S. 194 (2002). In Drayton, the Supreme Court held that among the relevant factors for assessing coercion is whether the officer requesting the search "indicated a command to consent to the search." Id. at 206. The defendant's consent, the Court held, was not a product of coercion because the officer had provided him with "no indication that he was required to consent to the search." Id. The officers had asked whether the defendant objected to the search, "thus indicating to a reasonable person that he or she was free to refuse." Id. The Court noted that there had been "no application of force, no intimidating movement, no overwhelming show of force, no brandishing of weapons, no blocking of exits, no threat, no command, not even an authoritative tone of voice."[4] Id. at 204.

The second is Florida v. Bostick, 501 U.S. 429 (1991). In Bostick, the Court addressed whether an officer's request to search a passenger's bags on a commercial bus constituted an unlawful seizure under the Fourth Amendment. Id. at 431. Although

---

[4] Although this language derives from Drayton's analysis of whether a seizure had occurred in that case, the Court noted that "[i]n circumstances such as these, where the question of voluntariness pervades both the search and seizure inquiries, the respective analyses turn on very similar facts." United States v. Drayton, 536 U.S. 194, 206 (2002). The Court's analysis of whether the defendant's consent was coerced invoked the factual discussion in its analysis of whether the defendant had been seized. Id.

-21-

on its face Bostick is about whether the defendant was seized, it is relevant. The Supreme Court's assessment of whether the police in Bostick seized the defendant turned on whether they had coerced him to consent to a search. Id. at 435-38. It held that the appropriate inquiry was whether, under the circumstances, "a reasonable person would feel free to decline the officers' requests or otherwise terminate the encounter." Id. at 436. The Court held that "[w]here the encounter takes place is one factor, but it is not the only one." Id.

Against this articulation of the clearly established law, we now turn to the facts of this case, taking all reasonable inferences in favor of the players. The defendants have largely accepted the plaintiffs' version of the facts for purposes of this summary judgment motion, but say that they would present their different version of the facts at trial.

The players point to three factual circumstances in arguing that no reasonably competent officer would have concluded that Coach Marchand's consent was valid. First, they note that Coach Marchand explicitly invoked his fear of the crowd, asking the officers, "what are they going to do to us[?]" shortly before the officers requested that Coach Marchand consent to a search of the players. Second, the players note that the officers did not actively seek to disperse the crowd, but only told the crowd to quiet down. Third, they note that the officers boxed in the

-22-

Central Falls bus, which effectively ensured that it could not leave until the police decided it could leave.

Although Coach Marchand may have subjectively felt coerced by the police and/or the crowd to give his consent, that is not the focus of the qualified immunity inquiry. Rather, the focus is on the viewpoint of an objectively reasonable officer. We cannot say that no reasonably competent officer would have concluded that Coach Marchand's consent was valid under clearly established Supreme Court case law. The players do not even allege that the officers commanded Coach Marchand to consent to a search, and the facts do not suggest that they did. Nor do the players allege that the officers threatened force or acted in an intimidating manner during their exchange with Coach Marchand and the Coventry Athletic Director. Indeed, Coach Marchand testified that the officers requested the search politely and acted courteously and professionally throughout their exchanges with him. The players do not even allege that the officers spoke to Coach Marchand with "an authoritative tone of voice" when they requested to do a search. See Drayton, 536 U.S. at 204.

Rather, the players' evidence depicts a difficult situation in which Coach Marchand faced a genuine choice between imperfect solutions. He could either consent to the search or require the police to pursue other legal paths if they wished to conduct one. As Coach Marchand said, it was his decision and he

-23-

decided "to take the high road, to take the safe road." Coach Marchand may have felt that the best way for him to get his players home safely and promptly was to submit to a search. He knew of the hostile crowd and was convinced that the players did not possess any of the purportedly missing items. By the time the police arrived, the Central Falls bus was already late going home, and Coach Marchand could have reasonably believed that school administrators and the players' parents were or would soon become worried about their whereabouts.

These circumstances do not establish that all reasonably competent officers would have concluded that Coach Marchand's will had been overborne or that his capacity for self-determination was critically impaired. See Watson, 423 U.S. at 424. Indeed, Coach Marchand testified that he "debated" telling the officers to get a search warrant, but rejected that option. Instead, he concluded that his role as coach was to ensure first and foremost that the players got home safely. A choice between undesirable options does not itself mean the choice was coerced and the consent given was involuntary. Like the officers in Drayton, the officers posed their search request as a question and did not make any showing that it could not be refused. We cannot say that a reasonably competent officer could only have concluded that Coach Marchand had no option but to consent due to coercion.

The factual details the players emphasize, addressed within the totality of the circumstances, do not demand a contrary conclusion. Coach Marchand's question, "what are they going to do to us[?]," would have alerted reasonable officers of his concerns about the situation. It may also be that reasonable officers would have recognized that the perceived threat from the crowd influenced Coach Marchand's decision. This does not mean, however, that all officers of reasonable competence would have concluded that Coach Marchand's will had been overborne. As Coach Marchand testified, he considered refusing the search and telling the officers to get a warrant.

As to the officers' efforts to subdue the crowd, by the time the officers spoke with Coach Marchand, they had restrained the crowd, told crowd members to cut it out, and established a buffer between the crowd and the bus. It may be that the officers would have done better to disperse the crowd altogether. This does not mean, however, that the officers are not entitled to immunity. The officers could have reasonably thought that they made clear that they would prevent the crowd from harming the players as of the time they asked Coach Marchand to consent to the search.

As to the police cruisers, the officers parked in a way that boxed in the bus before they became aware of the specific situation unfolding around it. The record is silent on whether alternatives were available. More importantly, the officers did

-25-

not convey to Coach Marchand that they would not move their cruisers until he agreed to a search. Nor were they asked to move the cruisers.

It is true that in a case concerning an involuntary seizure of a person, the Supreme Court used language that the police offered the person "no choice." Kaupp v. Texas, 538 U.S. 626, 631 (2003). But the circumstances there were a far cry from the choice Coach Marchand faced. In Kaupp an adolescent was rousted out of bed in the middle of the night wearing nothing but underwear, placed in handcuffs, and taken to a crime scene on his way to be interviewed at law enforcement headquarters. His statement of "Okay" in response to "we need to go and talk" was clearly not consent. See id. at 631-32. Nothing of that sort happened here, nor would a reasonable officer have thought it did.

On the plaintiffs' version of the facts, we cannot say that all officers of reasonable competence would have concluded that Coach Marchand's consent to the search was invalid. It is not enough that Coach Marchand described his consent to the search as coerced; coercion has a specific legal meaning. Even if Coach Marchand felt his consent was coerced within that specific legal meaning, this would not be sufficient to overcome the officers' assertion of qualified immunity. While a jury might find that Coach Marchand subjectively believed his consent was coerced, that is not the issue here; we must look to the view of the reasonable

-26-

officer.  See Barton v. Clancy, 632 F.3d 9, 30 (1st Cir. 2011). Like Coach Marchand, the police officers faced a tough decision in a difficult situation.  Whether the officers made the correct decision is not the point.

C.        Equal Protection and State Racial Discrimination Claims

The players argue that they have raised material facts showing that the officers' actions were impermissibly motivated by race in violation of the Equal Protection Clause and Rhode Island state laws.  There are disputes over whether the legal contours of the rights in question would have been clear to a reasonable officer and over whether a reasonable officer would have perceived a violation of recognized rights under the factual circumstances present in this case.  We begin with the rights in question and then assess the factual circumstances.

Our analysis under the Equal Protection Clause looks to "(1) whether the appellant was treated differently than others similarly situated, and (2) whether such difference was based on an impermissible consideration, such as race."  Macone v. Town of Wakefield, 277 F.3d 1, 10 (1st Cir. 2002).  A plaintiff must show that the defendant "selected or reaffirmed a particular course of action at least in part because of, not merely in spite of, its adverse effects" upon a protected group.  In re Subpoena to Witzel, 531 F.3d 113, 119 (1st Cir. 2008) (quoting Wayte v. United States, 470 U.S. 598, 610 (1985)) (internal quotation marks omitted).  Such

-27-

intent may be "inferred from the totality of the relevant facts." Donahue v. City of Boston, 371 F.3d 7, 14 (1st Cir. 2004) (quoting Washington v. Davis, 426 U.S. 229, 242 (1976)).

The players assert that this analysis forbids official actions that "effectuate the known discriminatory intention of others." Citing United States v. Yonkers Bd. of Educ., 837 F.2d 1181 (2d Cir. 1987), they argue that a police search that works to effectuate such discriminatory intentions voiced by a crowd violates the Equal Protection Clause. See id. at 1226. We read that decision more narrowly; in any event, it is insufficient to make plaintiffs' proposition into clearly established law. The players do not cite any cases from this court or the Supreme Court finding a violation of the Equal Protection Clause in the absence of purposeful discrimination on the part of the relevant officials. Accordingly, we hold that the players have not shown that it is clearly established that acts that effectuate the known discriminatory intent of others, without more, violate the Equal Protection Clause. See Davis, 426 U.S. at 241-42; McGuire v. Reilly, 386 F.3d 45, 63 (1st Cir. 2004).

Under our clearly established equal protection analysis, the players have failed to demonstrate that all officers of reasonable competence would have believed that the request for a search of the players produced differential treatment. Given that the public had access to the unlocked Coventry locker room, the

players argue that the officers had no more reason to search them than they had to search the crowd. Indeed, they argue that the officers had even less reason to search the players because the officers knew Coach Marchand had already searched them and a security guard had accompanied them into the locker room. These claims belie the undisputed fact that Coach Marchand identified the players as the "prime suspects" in his discussion with the police. Even if Coach Marchand merely intended to convey the crowd's opinion, members of the crowd had not been accused of theft.

Even if we assume that the officers had no more reason to search the players than the crowd, the players fail to produce sufficient evidence of discriminatory intent to defeat qualified immunity. This court has noted that discriminatory animus seldom "wears its garb openly" and more often comes "masked" in "subtle forms." Soto v. Flores, 103 F.3d 1056, 1067 n.12 (quoting Aman v. Cort Furniture Rental Corp., 85 F.3d 1074, 1082 (3d Cir. 1996)). Nonetheless, to survive summary judgment, the non-moving party must make more than "conclusory allegations, improbable inferences, or unsupported speculation." Pineda v. Toomey, 533 F.3d 50, 53 (1st Cir. 2008). A non-moving party must "set forth specific facts showing that there is a genuine issue for trial." Id. at 53-54 (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986)).

The players do not present such specific facts on the issue of racial animus in this case. They point to the alleged racial slurs made by the crowd and claim that the officers should have ordered the crowd to disperse or move farther away from the bus. They also claim that the officers sought to incite the crowd by displaying some of the players' iPods and cell phones. But testimony from both Coach Marchand and the players contradicts the inference that racial animus motivated the officers. No officer uttered a racial slur. It is uncontested that the officers acted courteously and told members of the crowd to stop jeering at the players. There is no evidence that all officers of reasonable competence would have believed the search was undertaken because of the national origin or race of the players.

Given this conclusion, the players also cannot defeat the officers' qualified immunity defenses against their claims under Rhode Island's Racial Profiling Prevention Act and Ethnic Intimidation Statute. The Racial Profiling Prevention Act covers "disparate treatment of an individual on the basis, in whole or in part, of the racial or ethnic status of such individual," with an exception not relevant here. R.I. Gen. Laws § 31-21.2-3. The Ethnic Intimidation Statute covers behavior "which would reasonably be construed as intended to harass or intimidate [a] person because of his or her race." R.I. Gen. Laws § 9-1-35(a). For the reasons

stated above, the players have not raised a genuine issue of material fact that satisfies either of these standards.

## III.

The record does demonstrate, regrettably, that the players were subject to ethnic animosity from Coventry inhabitants. Although the plaintiffs do not raise sufficiently material facts to survive summary judgment, the Town and its voters may wish to take steps to prevent recurrences of such behavior.

The judgment of the district court is <u>affirmed</u>.

**-Opinion Dissenting in Part Follows-**

THOMPSON, Circuit Judge, (Dissenting in part). I agree with my colleagues that a reasonable officer could have believed that Coach Marchand had in loco parentis authority to consent to the search of the players and that their equal protection claims must fail. My colleagues and I part company, however, on the issue of qualified immunity. Because I cannot subscribe to the majority's determination that the officers were entitled to qualified immunity because they could reasonably have believed that Coach Marchand voluntarily consented to the search of his students, I respectfully dissent.

## I.

The appellants, a team of young Hispanic soccer players from Central Falls, Rhode Island were subjected to shockingly disgraceful and humiliating conduct by the police and their fellow citizens alike while visiting another high school in Coventry, Rhode Island.[5] After playing a tense game against Coventry's team, the Central Falls players were surrounded by a mob seething with racial animosity and casting false accusations of theft. When the police arrived and observed the crowd's obstruction of the bus, they parked their cruisers in front of and behind the Central Falls team's bus, trapping them with their antagonists. Then, rather than take any action to meaningfully investigate any accusations or

---

[5] The record reflects that the Central Falls players were bi-lingual.

pacify the crowd, which continued to simmer menacingly, the officers questioned the Central Falls team and sought its coach's permission to search their belongings.

My colleagues think that a reasonable officer would be unaware of the duress this state of affairs would inspire in the team's coach. In my view, however, the officers' request of Coach Marchand while he was surrounded by an angry mob and unable to depart with his players left little room for choice. He was subjected to coercion which, though subtler than a peremptory command and more courteous than the irate mob, could hardly be plainer. This coercion vitiated any consent he could give, rendering the subsequent search unlawful.

The basic factual scenario is not largely disputed by the parties and my colleagues and I recognize that all reasonable inferences drawn from the facts are to be construed in the plaintiffs' favor.[6] Maj. Op. at 3. The officers invoked qualified immunity as a defense to their actions. My colleagues set out the relevant law, see Maj. Op. at 11-14, which I accept and reprise briefly.

---

[6] In their brief, the defendant officers note that if the case were to go to trial they would dispute both the number of spectators alleged to be watching the exchange as well as the plaintiffs' reference to the spectators as a "mob."

"Qualified immunity balances two important interests - the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." Pearson v. Callahan, 129 S. Ct. 808, 815 (2009).

To defeat the immunity, the players must show that (1) the officers "violated [their] constitutionally protected right" and (2) "the particular right . . . was clearly established at the time of the violation." Raiche v. Pietroski, 623 F.3d 30, 35 (1st Cir. 2010). Further, "in applying the second prong, we must consider two subsidiary issues: (a) the clarity of the law in general at the time of the alleged violation; and (b) the clarity of the law as applied to the case" - simply put, we ask "whether a reasonable [officer] in the defendant's shoes 'would have understood that his conduct violated the [players'] constitutional rights.'" Id. at 35-36 (quoting Maldonado v. Fontanes, 568 F.3d 263, 269 (1st Cir. 2009)). In undertaking this inquiry, we do not consider the defendants' subjective beliefs concerning the unlawfulness of their conduct. See Philip v. Cronin, 537 F.3d 26, 34 (1st Cir. 2008). Instead, this inquiry is based on an objective test - what a reasonable officer would have known. Id. Nonetheless, "[a] determination of objective reasonableness 'will

often require examination of the information possessed' by the defendant officials." Kelley v. LaForce, 288 F.3d 1, 7 (1st Cir. 2002) (quoting Anderson v. Creighton, 483 U.S. 635, 641 (1987)).

In granting qualified immunity to the officers, my colleagues analyzed only the second prong of the test, as permitted by Pearson. Maj. Op. at 12. Because I would deny qualified immunity, however, I must address both aspects of the analysis.

**A.**

The first prong of the qualified immunity test asks whether a violation of constitutional rights actually occurred. Raiche, 623 F.3d at 35. It has long been recognized that the Fourth Amendment bars all warrantless searches "subject only to a few specifically established . . . exceptions" such as the presence of probable cause, exigent circumstances, or valid consent. See Katz v. United States, 389 U.S. 347, 357, 357 n.19, 358 n.22 (1967). Accordingly, absent such an exception to the warrant requirement the officers' search of the Central Falls players was improper and a clear violation of the players' constitutional right to be free from warrantless searches.

The officers rely only upon Coach Marchand's consent to validate their search. Of course, the consent must have been voluntarily given. Bumper v. North Carolina, 391 U.S. 543, 548 (1968). That is, it must not have been the product of "duress or coercion," Schneckloth v. Bustamonte, 412 U.S. 218, 248 (1973), or

intimidation, Moran v. Burbine, 475 U.S. 412, 421 (1986), either express or implied.  See United States v. Vanvliet, 542 F.3d 259, 264-65 (1st Cir. 2008).  Because, as discussed below, I believe that a reasonable officer would have known that Coach Marchand's consent to the search of his players was coerced, the first prong of the qualified immunity test is easily satisfied: there was an actual violation in the form of an unconstitutional search.

**B.**

The second prong of the qualified immunity inquiry asks whether it was clear, both legally and factually, that the officers' search was non-consensual.  Raiche, 623 F.3d at 35.  My colleagues and I agree that it is clearly established under the Fourth Amendment that voluntary consent is required to validate a suspicionless, warrantless search and that "all officers of reasonable competence would have known that coercion vitiates consent to a search under the Fourth Amendment."  Maj. Op. at 17. We also agree that the presence of coercion is determined by an open-ended test that considers "'all the surrounding circumstances,' including 'subtly coercive police questions' and 'the possibly vulnerable subjective state of the person who consents.'"  Maj. Op. at 19 (quoting Schneckloth, 412 U.S. at 229). Where we disagree is whether the facts of this particular case, applied to that law, clearly make out a violation of the players' Fourth Amendment rights.  Ultimately, my colleagues "cannot say

-36-

that all officers of reasonable competence," confronted with the facts of this case, "would have concluded that Coach Marchand's consent to the search was invalid." Maj. Op. at 26. On the contrary, I believe that the players' rights were violated, and that a reasonable officer would have concluded that the search was unconstitutional.

**1.**

In analyzing the second prong of the qualified immunity test we must ask whether a reasonable officer in the defendants' position would have known that Coach Marchand felt coerced into consenting to the search. The central question, then, is how the reasonable officer would have assessed the voluntariness of Marchand's consent.

As we have explained, "[v]oluntariness is a question of fact that turns on [a] comprehensive assessment of the totality of the circumstances attending the interaction between [the individual] and the searching officers." Vanvliet, 542 F.3d at 264. Threats, intimidation, and coercion are all factors to consider in analyzing the totality of the circumstances, but they are not the only ones. See, e.g., United States v. Pérez-Montañez, 202 F.3d 434, 438 (1st Cir. 2000). Indeed, in considering the totality of the circumstances, no single coercive element will usually suffice to end the analysis. See Maj. Op. at 20 (citing W. LaFave, Search and Seizure § 8.2(b), at 62 (4th ed. 2004)).

-37-

Instead, we must look to the circumstances surrounding Marchand's consent and determine whether they establish that a reasonable officer could have concluded that he gave it voluntarily. See United States v. Twomey, 884 F.2d 46, 51 (1st Cir. 1989) (explaining that we must look to "all the circumstances surrounding the securing of the consent" when determining the voluntariness thereof).

Moreover, the determination of an individual's voluntariness in consenting to a search is a subjective, fact-intensive endeavor that "turns not on whether a 'reasonable' person in the [individual's] position would have felt compelled to consent to a police officer's request to search, but, rather, on whether the [individual] [him]self actually felt compelled to consent." United States v. Hall, 969 F.2d 1102, 1106 (D.C. Cir. 1992); accord Schneckloth, 412 U.S. at 226; Twomey, 884 F.2d at 51. Consent is coerced when an individual's "will ha[s] been overborne and his capacity for self-determination critically impaired" to the point that he does not face an "essentially free and unconstrained choice." United States v. Watson, 423 U.S. 411, 424 (1976)(internal quotation marks omitted).

Throughout this inquiry, we must recall that on summary judgment, when assessing the factual circumstances in which an individual consented to a search and the possible assumptions a reasonable officer might have made about the corresponding

-38-

voluntariness, "we are required to draw every reasonable inference in favor of the nonmoving party" – here the Central Falls players. Dennis v. Osram Sylvania, Inc., 549 F.3d 851, 858 (1st Cir. 2008); see also Vera v. McHugh, 622 F.3d 17, 27 n. 11 (1st Cir. 2010) (recalling "our duty to take the facts in the light most favorable to the nonmoving party on summary judgment"). This is a tough case, but in my view the balance tips against qualified immunity.

**2.**

Having set out the relevant law, I turn now to the factual analysis.

The majority justifies its determination that Marchand's consent was valid in large part based on United States v. Drayton, 536 U.S. 194 (2002). In Drayton, three police officers boarded a bus as part of a routine drug and weapons interdiction. One officer was at the front of the bus, facing the rear, and another officer was at the rear of the bus, facing forward. The third officer walked down the bus aisle from the back to the front, stopping to speak with passengers along the way. Neither the aisle nor the front exit was ever blocked. Passengers who declined to speak with the officer or who chose to exit the bus were allowed to do so. As the officer approached Drayton's seat, he showed his badge and stated that his purpose on the bus was to look for drugs and guns. The officer asked if Drayton and his companion, Brown, had any bags. They answered affirmatively, so the officer asked

-39-

for permission to search the bags. Brown agreed and no contraband was found. The officer then asked if he could conduct a patdown of Brown. He agreed and was arrested after the patdown revealed contraband. The same is true of Drayton. A further search revealed that both individuals had cocaine taped between their shorts. Drayton and Brown were charged with federal drug crimes and moved to suppress the cocaine on the ground that their consent to the patdown search was invalid. The Supreme Court held that the defendants' consent was not a product of coercion because, among other reasons, there had been "no threat, no command, [and] not even an authoritative tone of voice." Id. at 204.

Relying on Drayton, my colleagues place great stock in the politeness with which the officers interacted with Coach Marchand and the students.[7] Without a doubt, had the officers commanded Marchand to submit, or acted in a threatening, domineering, boorish, or otherwise inappropriate way, this case would be easier. But the fact that the officers were polite, particularly given all else that was occurring at the highly charged scene, does not establish that Marchand was not coerced. The Supreme Court has explained that subtle and polite coercion is

---

[7] Though I would hardly describe the decision to conduct an invasive search of the players in front of a hostile, jeering, photo-taking crowd as "polite," the players do not appear to challenge this characterization.

-40-

just as objectionable as more obvious browbeating.  Schneckloth, 412 U.S. at 228.

Furthermore, we have admonished courts to "go beyond appearances and inquire whether the consent was a voluntary, intentional and understood waiver of a known right, or, on the contrary, was the product of deceit, duress and coercion, actual or implicit." United States v. Berkowitz, 429 F.2d 921, 925 (1st Cir. 1970)(internal quotation marks omitted).  The "beyond appearances" inquiry is particularly important here: though the police may have been polite and refrained from issuing commands in an authoritative tone of voice, they nonetheless blocked the bus in, leaving the players no way out, essentially "appeas[ing] the masses" who were "crying for [the players'] heads."  Maj. Op. at 6 (internal quotation marks omitted); see also infra at 12-15.  Ultimately, the officers' demeanor can be but one factor in our analysis, and certainly "not the only one."  Florida v. Bostick, 501 U.S. 429, 437 (1991).

Similarly, although the majority is correct that the officers' failure to notify Marchand that he could refuse to consent is not dispositive, Maj. Op. at 20, it is yet one more factor of the many in this narrative that, taken together, militate against qualified immunity in this case.  See Schneckloth, 412 U.S. at 227 ("[T]he failure of the police to advise the accused of his rights [is] certainly [a] factor[] to be evaluated in assessing the

-41-

'voluntariness' of [his] [consent] . . . .”); see also Drayton, 536 U.S. at 202 (quoting Bostick, 501 U.S. at 432)(explaining that one factor "particularly worth noting" when considering whether consent to search was coerced was that the officer had advised the passenger of his right to refuse to consent).

Like the issue of politeness and failure to warn an individual of his right to refuse consent, police custody is yet another factor worthy of consideration. Watson, 423 U.S. at 424. True, "custody alone has never been enough in itself to demonstrate . . . coerced . . . consent to search," 423 U.S. at 424, but we have previously observed that "sensitivity to the heightened possibility of coercion is appropriate when a[n] [individual's] consent is obtained during custody," United States v. Barnett, 989 F.2d 546, 555 (1st Cir. 1993).

There is no question that Marchand was in police custody at the time he consented to the search.[8] The officers parked their cruisers in front of and behind the players' bus, preventing them from leaving. This alone distinguishes our case from Drayton, which involved "no blocking of exits." 536 U.S. at 204. In Drayton, even though there was an officer at the front of the bus, "he said nothing to suggest that people could not exit and . . .

---

[8] There is no need to determine whether Marchand was in legal custody. By "custody" I refer only to the factual scenario by which the bus was blocked in by police cruisers, effectively blocking any means of exit for the plaintiffs.

left the aisle clear." Id. at 205. This is significantly different from the facts of the present case where the players' bus was completely boxed in by patrol cars. Surely, no reasonable officer could have believed that the plaintiffs felt free to leave.

Of course, it may be true that the officers trapped the players with the crowd before they were aware of the nature of the controversy and of the danger, fear, and concomitant coercion they would cause by doing so. See Maj. Op. at 25. But this is beside the point: at the time the officers sought Marchand's permission to search the players a reasonable officer would certainly have been aware, at that crucial moment, that the positioning of their cruisers left the players with no way out. Cf. Terry v. Ohio, 392 U.S. 1, 21-22 (1968) (explaining in analogous context that in evaluating the reasonableness of a search or seizure, courts look to the state of the facts "at the moment of the seizure or the search"). Regardless, Marchand's fearful inquiry of the officers in response to their request for consent ("[w]hat [is the crowd] going to do to us?") should have made apparent the fear elicited in him by being blocked in with the crowd.

The majority states that "[t]he officers could have reasonably thought that they made clear [to Coach Marchand] that they would prevent the crowd from harming [his] players . . . ." Maj. Op. at 25. This conclusion is incredible - particularly in light of the fact that the officers never responded to Marchand's

initial inquiry regarding the crowd's behavior.  In addition, there were only four officers on the scene, yet they were responsible for controlling an angry, boisterous, irrational crowd of approximately fifty to sixty people.  With a mere six to ten feet buffer between the hostile crowd and the players, I cannot fathom how any reasonable officer would think that the defendants made clear to Coach Marchand that he and his players would go unharmed. The majority points out that "the officers did not convey to Coach Marchand that they would not move their cruisers until he agreed to a search" and that the officers "were [not] . . . asked to move the cruisers."  Maj. Op. at 26.  That may very well be the case,  but so too is the converse - the officers never offered nor took any action to move their cruisers on their own before soliciting Coach Marchand's permission.

Nevertheless, Marchand's fearful inquiry shows that he felt threatened and intimidated by the crowd.  That Marchand did not translate his fear and intimidation of the crowd into a particularized request - for example, by asking the officers to move their cruisers or asking if there were any other options other than consenting to a search of his players - does not eliminate this factor from consideration.   As the Supreme Court has explained, "the crucial test is whether, <u>taking into account all of the circumstances surrounding the encounter</u>, the police conduct would have communicated to a reasonable person that he was not at

-44-

liberty to ignore the police presence and go about his business."
Bostick, 501 U.S. at 437 (emphasis added)(internal quotation marks omitted). Any officer should have recognized that Coach Marchand did not feel at liberty to leave.

The majority acknowledges that "the players' evidence depicts a difficult situation in which Coach Marchand faced a genuine choice between imperfect solutions," Maj. Op. at 23, but nonetheless decides that "these circumstances do not establish . . . that Coach Marchand's will had been overborne or that his capacity for self-determination was critically impaired." Id. at 24. To support this conclusion the majority notes that Coach Marchand testified at his deposition that he "'debated' telling the officers to get a search warrant, but rejected that option," after weighing his alternatives, Maj. Op. at 24, and ultimately "concluded that his role as coach was to ensure first and foremost that [his] players got home safely" Id. But Coach Marchand's thought process, and the actions he "debated" taking, are completely irrelevant. Marchand's testimony was given after the fact and was not communicated to any officer at the scene of the incident. The hypothetical reasonable officer cannot read minds; therefore, in analyzing whether such an officer would have known that Coach Marchand's consent was coerced, it is simply common sense that only facts actually communicated to or observed by the officer are relevant.

-45-

My colleagues are apparently of two minds on this issue: though they initially rely on Marchand's uncorroborated description of his internal thought process in an effort to negate the coercion he suffered, they later recognize that his subjective, unexpressed thoughts and feelings are irrelevant when dismissing Marchand's testimony that he felt coerced into consenting. see Maj. Op. at 26 ("It is not enough that Coach Marchand described his consent to the search as coerced; . . . [w]hile a jury might find that Coach Marchand subjectively believed his consent was coerced that is not the issue here; we must look to the view of the reasonable officer."). As I have previously discussed, Marchand's objective manifestations of coercion were amply supported by evidence available to the officers. In analyzing the coercive atmosphere under which Marchand gave his consent, I would consider only those facts available to a reasonable officer at the time of the search.

If more were needed, and I doubt that there is, the officers exacerbated the situation by "ma[king] little to no effort to quell or disperse the crowd, even as [it] verbally assailed the players[,] shouting racist epithets and accusations of theft." Lopera v. Town of Coventry, 652 F. Supp. 2d 203, 210 (D.R.I. 2009). With the possibly violent assembly looming, the officers questioned Marchand. Taking the crowd's word over Marchand's, they elected to pursue a search of the Central Falls students before adequately

calming the mob or even ascertaining what, if anything, had actually been stolen.

My colleagues, in further reliance on Drayton, note that there was no testimony that the request to search was made in "an authoritative tone of voice." Maj. Op. at 23 (internal quotation marks omitted). But tone of voice cannot be dispositive of the coercion inquiry. Al Capone said you can get more with a kind word and a gun than with just a kind word; a mob can be just as "convincing" as a gun.

The officers knew that Marchand felt threatened by the crowd. They knew he had already capitulated to the intense coercion and intimidation exerted by the mob, delaying his team's departure for about a half-hour to engage in a search that he knew beforehand would be futile in order to satisfy the crowd's demands. Still, the officers did practically nothing to assuage that fear or mitigate the coercion, and indeed kept the players' bus trapped with the crowd for more than ten minutes before capitalizing on Marchand's weakened state to elicit consent for a duplicative search. Without a doubt, such behavior is contrary to the general recognition that police officers have a duty to protect the public and public safety. See, e.g., Bordanaro v. McLeod, 871 F.2d 1151, 1164 (1st Cir. 1989)(referencing district court's assertion in excessive force case that "the primary duty of the police

departments and policemen is to protect and preserve life and property and the public peace")(emphasis added).

It is inappropriate to create an artificial dichotomy between the coercion applied by the officers and that applied by the crowd they failed to adequately control, and then to omit the latter from consideration. To do so subverts the totality-of-the-circumstances analysis that is required of us. Even the majority recognizes this. In rejecting the officers' argument that coercion, in the context of Fourth Amendment analysis, must "'emanat[e] from the police officers themselves rather than any subjective or outside influence,'" the majority noted that clearly established law requires consideration of "all the surrounding circumstances." Maj. Op. at 17-18 (citing Schneckloth, 412 U.S. at 227, and concluding that Colorado v. Connelly 479 U.S. 157 (1986), which held that "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause," id. at 167, does not extend to Fourth Amendment consent cases).

A reasonable officer in the defendants' position would have known that Marchand, who expressed fear of the crowd, was under a significant amount of duress. This duress was caused both by the raucous mob hurling menacing accusations, threats, and racial epithets and the officers themselves, who blocked Marchand's team in with the crowd, failed to take adequate measures to calm or

-48-

disperse it, and immediately took its side against Marchand upon arriving, despite lacking any reasoned basis for doing so.  Given the officers' exchange with Marchand, they knew or at least should have objectively known, that he felt constrained by their failure to disperse the crowd or allow the bus to leave and that he feared the racial animus in the crowd aimed at his players.  On these facts, a reasonable officer would have known that Marchand believed he had no option for getting his students home safely but to consent to their demand for a search.  Moreover, a reasonable officer would conclude that Marchand's responsibility for the safety of his charges and his increasing tardiness in getting them home would make him particularly vulnerable to this type of coercion.

### III.

I am gravely concerned that our case law is treading terribly close to creating "an impenetrable defense for government officals" and a "significant risk that qualified immunity will always attach." Savard v. Rhode Island, 338 F.3d 23, 41 (1st Cir. 2003)(equally divided en banc court)(opinion of Bownes, J.).  The Fourth Amendment is one of our most precious constitutional rights. We should not so comfortably defer to the judgment of government officials at the cost of eviscerating such a fundamental right of our citizens - a right this nation has declared deserves the highest protection.  Indeed, our task in undertaking a qualified

-49-

immunity inquiry requires the contrary. It is after all "an attempt to balance competing values: not only the importance of a damages remedy to protect the rights of citizens, but also 'the need to protect officials who are required to exercise their discretion and the related public interest in encouraging the vigorous exercise of official authority.'" Harlow v. Fitzgerald, 457 U.S. 800, 807 (1982)(quoting Butz v. Economou, 438 U.S. 478, 504-06 (1978))(citation omitted).

With these concerns in mind and taking, as I must, every inference available in the record in favor of the plaintiffs, I cannot say that a reasonable officer in the defendants' position could have concluded that Marchand voluntarily consented to the search. The Central Falls team's rights were violated; the violation was clear; and a reasonable officer should have recognized it. I would vacate the district court's entry of summary judgment and remand for resolution of the factual disputes upon which the officers' claim of qualified immunity turns.