# United States Court of Appeals
## For the First Circuit

No. 12-2191

ROSEMARIE O'CONNELL; ALEJANDRO FRANCO,

Plaintiffs, Appellants,

v.

HUMBERTO MARRERO-RECIO, in his personal and official capacity;
JORGE GARCÍA-FANEYTT, in his personal and official capacity;
JESÚS MÉNDEZ-RODRÍGUEZ, in his personal and official capacity,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Aida M. Delgado-Colón, U.S. District Judge]
[Hon. Marcos E. López, U.S. Magistrate Judge]

Before

Torruella, Selya and Lipez,
Circuit Judges.

Harry Anduze-Montaño, with whom José A. Morales-Boscio was on brief, for appellants.
Michelle Camacho-Nieves, Assistant Solicitor General, Department of Justice, with whom Margarita Mercado-Echegaray was on brief, for appellees.

July 22, 2013

**TORRUELLA, Circuit Judge.** After brief stints as the Human Resources Director of two Puerto Rico governmental agencies, Plaintiff-Appellant Rosemarie O'Connell sued her former supervisors seeking redress under 42 U.S.C. § 1983 and the laws of Puerto Rico. The district court dismissed some of her claims at the pleading stage, and the rest at summary judgement. O'Connell now appeals the dismissal of three of those claims.

Specifically, O'Connell first challenges the dismissal of her First Amendment free speech claim, arguing that the district court erred in finding that her "speech" exclusively revolved around her professional responsibilities as Human Resources Director. Second, O'Connell challenges the dismissal of a claim she made under the Puerto Rico Whistleblowers Protection Act ("Law 426"), P.R. Laws Ann. tit. 1, § 601, and takes issue with the court's determination that she never engaged in the kind of whistleblowing activities protected under the statute. Third, O'Connell challenges the judgment on her First Amendment freedom of association claim. According to O'Connell, the court erred in holding the First Amendment inapplicable to her position as Human Resources Director.

After careful consideration, we affirm the district court on all fronts.

## I. Background[1]

After the New Progressive Party ("NPP") won Puerto Rico's November 2008 general elections, O'Connell, a long-time NPP affiliate,[2] became the Human Resources Director of the Puerto Rico Permits and Regulation Administration (Spanish acronym "ARPE"). Shortly thereafter, Defendants-Appellees, Humberto Marrero-Recio and Jorge García-Faneytti, also NPP affiliates, were respectively appointed as the first and second in command at ARPE.[3] O'Connell, Marrero, and García appear to have coexisted without conflict during their first months at ARPE.

Things changed in May 2009 when an NPP primary election pitted O'Connell and Marrero's candidates against each other. When Marrero learned that O'Connell stood in a different camp for the election, he prohibited her from campaigning in favor of her

---

[1] We state the facts underlying O'Connell's claims as alleged in her complaint. S.E.C. v. Tambone, 597 F.3d 436, 438 (1st Cir. 2010). When reviewing the summary judgment ruling, see infra Part II (B), we use only those facts that are properly documented in the summary judgment record.

[2] As an active member of the NPP, O'Connell has held different leadership positions through the years, including, for example, Regional Director of the Women's Organization, Electoral Director for the Carolina Region, and "Get Out to Vote" Regional Director. In the 2007 NPP primary election, O'Connell unsuccessfully ran for a Senate seat representing the Carolina District. She has also worked within the NPP Human Resources Professional Group of the Public Employment Coalition as well as coordinated several NPP activities.

[3] Marrero remained as ARPE's Administrator until October 8, 2009, when he was appointed to a different position at another governmental agency. García succeeded him as ARPE's Administrator.

candidate. Marrero also threatened her by stating that "he did not want to learn that she voted in the primaries for [her candidate]." O'Connell voted for her candidate anyway, and a few days after the election, Marrero told O'Connell that he knew how she had voted and that, from that point on, she was not allowed to engage in any "off-office" political activities. Marrero also enlisted some of his subordinates at ARPE to spy on O'Connell. A clandestine newsletter circulating at ARPE stated that O'Connell was being videotaped and that she held a parallel private-sector job. O'Connell later learned that a subordinate of Marrero was responsible for the publication of the newsletter and that Marrero exerted control over its content.

O'Connell and Marrero also butted heads when it came time to implement the "Special Act Declaring a State of Fiscal Emergency," also known as "Law 7." As ARPE's Human Resources Director, O'Connell was responsible for determining and reporting the agency employees' "years of service" to a so-called Stabilization Board created under Law 7. The Board was required to determine the respective "seniority" of each employee in order to make downsizing decisions. Employees could challenge the Board's determinations within a period of 30 days.

In an attempt to prevent the possible layoff of certain NPP employees under Law 7, Marrero instructed O'Connell to falsify their personnel records by increasing their years of service. She

refused, and, a few days later, García made the same request. But O'Connell reaffirmed her position "and explained that the[] same employees [had] failed to challenge the calculated time within the term established by Law 7 [and] [t]hat it was illegal for her to change the numbers adjudicated by the Stabilization Board."

Unable to impose his will over O'Connell, Marrero entrusted one of his subordinates with reviewing employees' challenges to the year-of-service computations made by the Stabilization Board. Marrero then instructed O'Connell to certify the work of his subordinate without validating the information provided to her. She refused and told Marrero that "the Internal Auditor, the IT Director, the License Supervisor, and human resources personnel would verify the calculations."

O'Connell and Marrero's working relationship continued to deteriorate as she consistently refused to follow his politically motivated orders. For example, among other things, O'Connell refused to acquiesce to Marrero's wishes to (1) reinstate an NPP employee who was previously terminated because of dishonesty; (2) ignore an Office of Government Ethics request for information as to possible unethical conduct at the agency; (3) disregard personnel related inquiries made by NPP employees considered to be traitors because they were friends with employees affiliated with the opposing party; and (4) arbitrarily transfer an ARPE employee as punishment for supporting the opposing party. In refusing to act

as instructed, O'Connell told Marrero that his requests "could not be legally justified and would surely bring upon [them negative legal repercussions]." Marrero responded "that he was 'disappointed' with her failure to act according to his wishes." And when O'Connell reinstated the duties of another employee affiliated with an NPP opponent, Marrero responded by having an employee under his direct supervision threaten her, stating that "those who do not follow our instructions (gestured by 'passing a finger across his neck') . . . [and we] know where your husband works and where your daughter studies."

O'Connell tendered her resignation on October 9, 2009, effective on December 15, 2009. A few days later, however, O'Connell received an offer to become the Human Resources and Labor Relations Director for the Puerto Rico Public Buildings Authority (Spanish acronym "AEP") under the direction of Defendant-Appellee Jesús Méndez-Rodríguez (together with Marrero and García, "Defendants"). She accepted the offer and changed the effective date of her resignation to October 31, 2009. But during O'Connell's first day at AEP, Méndez summoned her to a meeting and informed her that "she was [being] terminated immediately" because Marrero had threatened to cause problems if she was employed at the agency. As O'Connell left the AEP building, she came across an edition of ARPE's clandestine newsletter already in circulation stating that she had been immediately terminated from AEP.

O'Connell filed her complaint on October 7, 2010, and amended it on January 19, 2011. O'Connell divided Count One of her amended complaint into two sections. The first section claimed that she had been constructively discharged at ARPE, and then discharged at AEP, due to her allegiance with an NPP faction disfavored by Defendants, in violation of her First Amendment freedom of association rights. The second section claimed First Amendment free speech violations in the form of retaliation on account of "her refusal to partake in the[] illegal actions" requested by Marrero and García. O'Connell's Law 426 claim was pled in Count Five of the amended complaint, which stated that "Defendants took an adverse employment action against Plaintiff because of her 'whistleblowing' actions."

In due course, Defendants moved to dismiss the amended complaint under Federal Rule of Civil Procedure 12(b)(6). The district court granted the motion in part, dismissing O'Connell's First Amendment retaliation claim as well as her Law 426 claim. In so holding, the court rejected O'Connell's contention that the complaint sufficiently pled retaliation based on the different actions Marrero and García took upon her refusal to follow personnel-related orders that she considered illegal and politically motivated. The court reasoned that O'Connell's "speech" was made in response to Marrero's orders "pursuant to her professional activities and, therefore, d[id] not fall under the

First Amendment's protections."  In connection with O'Connell's Law 426 claim, the court agreed with Defendants that the complaint failed to allege "the misuse of public property or public funds" required for a valid whistleblowing claim under that law.

Once discovery concluded, Defendants moved for summary judgment in connection with O'Connell's First Amendment freedom of association claim and the remaining state law claims.  As relevant here, they argued that O'Connell's Human Resources positions at ARPE and AEP were "trust" and "policy-making" positions exempted from the protection of the First Amendment.  In opposition, O'Connell stated that the responsibilities of her positions resembled those of a technocrat and not a policymaker given that Law 7 had "stripped" her job of any discretion and "severely curtailed" her supervisory duties.  In a thorough, well-reasoned opinion, the district court sided with Defendants, and this appeal timely ensued.

## II. Discussion

### A. <u>Challenges to the Pleading Stage Dismissals</u>

We review the district court's ruling on a motion to dismiss <u>de novo</u>, accepting all well-pled facts in the complaint as true, and drawing all reasonable inferences in favor of the plaintiff.  <u>Ocasio-Hernández</u> v. <u>Fortuño-Burset</u>, 640 F.3d 1, 7 (1st Cir. 2011); <u>Gargano</u> v. <u>Liberty Int'l Underwriters, Inc.</u>, 572 F.3d 45, 48 (1st Cir. 2009).  Dismissal for failure to state a claim is

-8-

warranted when the complaint lacks "sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). We make this determination through a holistic, context-specific analysis of the complaint, which, in some cases, can represent a formidable undertaking. See Iqbal, 556 U.S. at 679; Maldonado v. Fontanes, 568 F.3d 263, 268 (1st Cir. 2009). However, where, as here, a district court "accurately takes the measure of a case, persuasively explaining its reasoning, and reaches a correct result, it serves no useful purpose for a reviewing court to write at length in placing its seal of approval on the decision below." Moses v. Mele, 711 F.3d 213, 216 (1st Cir. 2013). We therefore limit our discussion to the bare essentials.

### 1. O'Connell's First Amendment Retaliation Claim

Our analysis begins with O'Connell's claim that Defendants impinged on her First Amendment rights in retaliating against her for refusing to partake in "unethical, unlawful and discriminatory practices." She claims that her refusals constituted protected "speech." We disagree.

Under the three-part test applicable here, the threshold inquiry is whether O'Connell spoke as a citizen on a matter of public concern. See Decotiis v. Whittemmore, 635 F.3d 22, 29 (1st Cir. 2011) (citing Curran v. Cousins, 509 F.3d 36, 45 (1st Cir.

-9-

2007)), and Pickering v. Bd. of Educ., 391 U.S. 563, 568 (1968)).[4] A dispositive factor in this determination is whether the "speech" underlying O'Connell's claim was made "pursuant to [her] official duties." Garcetti v. Ceballos, 547 U.S. 410, 421 (2006). If the answer to this inquiry is in the affirmative, then O'Connell has no First Amendment claim, since "restricting speech that owes its existence to a public employee's professional responsibilities does not infringe any liberties." Id. at 421-22.

As the district court correctly held, the "speech" underlying O'Connell's claim was made pursuant to her duties as ARPE's Human Resources Director. According to Count One of her complaint, O'Connell's alleged protected speech consisted exclusively of several instances in which she communicated to Marrero and García her reluctance to undertake personnel-related actions that she deemed either illegal or unethical. In other words, O'Connell's "speech" solely focused on events at her workplace and was made exclusively to fulfill her responsibilities as ARPE's Human Resources Director. This type of communication is the quintessential example of speech that owes its existence to a

---

[4] For the second prong, "the court must balance the interest of the employee, as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." Decotiis, 635 F.3d at 29 (citations, alterations, and quotation marks omitted). Under the third prong, "the employee must show that the protected expression was a substantial or motivating factor in the adverse employment decision." Id. (citations omitted).

public employee's professional responsibilities and thus is not protected under the First Amendment. See, e.g., Garcetti 547 U.S. at 421-22 (finding the First Amendment Free Speech clause inapplicable to prosecutor's memo on "the proper disposition of a pending criminal case" as it was written in conjunction with his professional responsibilities and it was part of what he was paid to do); Foley v. Town of Randolph, 598 F.3d 1, 7-8 (1st Cir. 2010) (finding no First Amendment protection where the chief of the fire department addressed the media in an official capacity during a press conference when he was on duty, in uniform, at the scene of a fire, and speaking alongside the State Fire Marshal on matters concerning the fire department's funding). For that reason, O'Connell is unable to state a plausible claim for relief and our Decotiis inquiry ends.

O'Connell contends that the district court disregarded well-pled allegations stating that she suffered retaliation for participating in the NPP's primary election against Marrero's wishes. O'Connell, however, did not premise her First Amendment retaliation claim on those allegations. Count One, subsection B (entitled "Retaliation") of her first amended complaint makes plain that O'Connell's retaliation claim arose out of Marrero and García's actions in connection with her refusal to go along with their alleged illegal orders:

> Defendants violated Plaintiff's First
> Amendment rights as she suffered [D]efendants'
> retaliation for refusing to follow politically
> motivated illegal employment actions to favor
> members of her own party, and for opposing
> orders from the codefendants to injure members
> of the opposing party . . . . O'Connell
> engaged in protected speech while refusing to
> follow the unethical, unlawful and
> discriminatory practices ordered by
> [D]efendants.

Similarly, O'Connell's opposition to Defendants' motion to dismiss restated that Defendants' "retaliation was due to Plaintiff's refusal to violate the law and her duties as a public servant in order to accommodate defendants' requests to favor their political protegees and to illegally affect others that were not . . . ."[5] The district court therefore had no reason to factor into its analysis of O'Connell's retaliation claim the allegations concerning her participation in the NPP's primary elections. See Rivera-Gomez v. de Castro, 843 F.2d 631, 635 (1st Cir. 1988) ("Judges are not expected to be mindreaders. Consequently, a litigant has an obligation to spell out its arguments squarely and distinctly or else forever hold its peace.") (internal citation and quotation omitted). Neither do we. United States v. Slade, 980

---

[5]  Defendants' motion to dismiss unequivocally argued that O'Connell's retaliation claim failed because it was premised on "speech" that exclusively arose from her professional responsibilities. If O'Connell felt that Defendants were misconstruing her retaliation claim, she could (and should) have stated so in her opposition or requested leave to amend the complaint. She did neither.

F.2d 27, 30 (1st Cir. 2013) ("It is a bedrock rule that when a party has not presented an argument to the district court, she may not unveil it in the court of appeals.").

Let us be perfectly clear. We in no way condone conduct of the type that O'Connell attributes in her complaint to Marrero and García. But federal law does not provide a remedy for every kind of misfeasance by a local official, no matter how unattractive, and O'Connell has not plausibly alleged a timely argued violation of any federally assured right.

### 2. O'Connell's Law 426 Claim

Next, we consider O'Connell's contention that her complaint plausibly pled a Law 426 whistleblowing claim. Law 426 was enacted to protect

> the rights of public employees and officials who <u>disclose information or testify</u> on alleged improper or illegal acts regarding the use of public property or funds that due to their nature constitute acts of government corruption or fall within the ethical conduct regulated by our legal system.

P.R. Laws Ann. tit. 1, § 601. (emphasis added). Its provisions, among other things, make it illegal to dismiss, threaten, or discriminate against any public employee who discloses or attempts to disclose, "before any official or employee with investigative functions or before a state or federal legislative, administrative or judicial forum," the improper or illegal misuse of public funds, acts of corruption, abuse of authority, or other qualified

-13-

information.  P.R. Laws Ann. tit. 1, § 603(a), (b)(1).  Therefore, in order to lay out a plausible whistleblowing cause of action under Law 426, the statute's plain language calls for a complaint to state three threshold allegations: (1) that the plaintiff was aware of qualified information; (2) that she reported or attempted to report that information to an investigatory agent or to a forum with administrative, legislative, or judicial authority; and (3) that she was retaliated against on account of such reporting or attempted reporting.

In dismissing O'Connell's Law 426 claim, the district court held that O'Connell's complaint had "not alleged that [she] ever reported the misuse of public property or public funds . . . ."  O'Connell disagrees and argues that Marrero and García's orders in connection with the "years-of-service" report provided to the Stabilization Board constituted acts of financial malfeasance directly falling under Law 426's purview.  She reasons that the Stabilization Board was to use that report in implementing personnel-related decisions, and that Marrero and García's orders would have eventually impacted public funds.  O'Connell, however, never raised this argument below.  In fact, the following sentences encompass the entire extent of O'Connell's memorandum in opposition to the dismissal of her Law 426 claim: "Plaintiffs' averments amply showed the corrupted conduct engaged by the [D]efendant[s].  Thus, Defendant[s]' Law 426 argument is meritless."  Accordingly, we need

not consider O'Connell's eleventh-hour contentions at this juncture.  Slade, 980 F.2d at 30.  In any event, even if we were to do so, the fact remains that O'Connell's complaint nowhere alleges that she ever disclosed or attempted to disclose Marrero and García's alleged financial wrongdoing to anybody with investigating authority, or to an otherwise qualified forum, and this in itself is fatal to her contentions under Law 426's whistleblowing provisions.

In the alternative, O'Connell argues that the district court construed Law 426 too narrowly in limiting its application to instances of financial malfeasance reporting.  In support, she alludes to subsection b(3) of Law 426, which, in pertinent part, provides that "[n]o public employee who has authority to influence, recommend or approve any action, shall make adverse or discriminatory decisions regarding any public official or employee for [...] [r]efusing to obey an order to carry out an act or omission that would bring about the violation of a law or regulation."  P.R. Law Ann. tit. 1, § 603(b)(3) (emphasis supplied).  O'Connell also underscores complaint allegations specifically stating that Marrero and García discriminated against her because she refused to carry out orders that would have violated the law.

Her contentions on this front appear to have some merit.  After all, the allegations she brings to our attention seem to

depict the exact same conduct prohibited under § 603(b)(3).

Nevertheless, O'Connell failed to raise this argument during the district court's proceedings. In fact, when Defendants moved to dismiss her Law 426 claim, they argued that she exclusively asserted whistleblowing claims.[6] O'Connell responded with the pair of perfunctory, generic sentences highlighted above, and never argued that § 603(b)(3) was implicated in this case. O'Connell is therefore in no position to challenge the application of Law 426 on grounds that she failed to raise before the district court, namely, that her claim was premised on subsection b(3). United States ex rel. Estate of Cunningham v. Millennium Labs. of CA, Inc., 713 F.3d 662, 674 (1st Cir. 2013) ("If any principle is settled in this circuit, it is that, absent extraordinary circumstances, legal theories not raised squarely in the lower court cannot be broached for the first time on appeal.") (citations omitted).

     B. Challenge to the Summary Judgment Order

---

[6] We find that Defendants interpreted O'Connell's complaint coherently, given the way in which she articulated her Law 426 Count:

> These statutes [including Law 426] imposed as sanctions, the payment of double damages against those employers that take adverse employment actions, including to terminate any employee, in retaliation for claiming her protected rights and for engaging in speech of public concern ("whistleblowing"). In the instant case, Defendants took an[] adverse employment action against Plaintiff because of her "whistleblowing" actions.

-16-

Last, we consider O'Connell's argument that the district court erred when summarily dismissing her First Amendment freedom of association claim. We review the district court's entry of summary judgment de novo, Wojcik v. Mass. State Lottery Comm'n, 300 F.3d 92, 98 (1st Cir. 2002), and affirm when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Farmers Ins. Exch. v. RNK, Inc., 632 F.3d 777, 782 (1st Cir. 2011). Even though we are not wedded to the district court's rationale, and can affirm on any ground made manifest by the record, O'Brien v. Town of Agawam, 350 F.3d 279, 292 (1st Cir. 2003), when the lower court produces a well-reasoned on-point decision, as in the present case, we generally track the court's steps and refrain from writing at length, Lawton v. State Mut. Life Assur. Co. of Am., 101 F.3d 218, 220 (1st Cir. 1996).

In the First Circuit, it is a settled principle that the First Amendment does not protect all government employees from layoffs based on political-party affiliation. Flynn v. City of Boston, 140 F.3d 42, 46 (1st Cir. 1998). We employ a two-pronged test to determine whether a particular public employee can be properly terminated on account of political-party affiliation. First, we look to whether "the discharging agency's functions entail decision making on issues where there is room for political disagreement on goals or their implementation." Rosenberg v. City of Everett, 328 F.3d 12, 18 (1st Cir. 2003) (quoting Roldán-Plumey

v. <u>Cerezo-Suárez</u>, 115 F.3d 58, 61-62 (1st Cir. 1997)) (internal quotations omitted).  Then we determine whether "the particular responsibilities of the plaintiff's position resemble those of a policy maker, privy to confidential information, a communicator, or some other office holder whose function is such that party affiliation is an equally appropriate requirement for continued tenure."  <u>Id.</u>

Here, on the first prong, we find that both discharging agencies, ARPE and AEP, are involved in decision-making on issues for which there is room for political disagreement.  On the one hand, ARPE, among other things, is charged with the administration of the permit process for every construction project in Puerto Rico.  We thus agree with the district court in <u>Velázquez</u> v. <u>Quiñones</u>, 550 F.Supp.2d 243, 249 (D.P.R. 2007), that the agency "plays a vital role in the implementation of any administration's urban planning policies."  It is certainly not difficult to fathom how different political factions could disagree on these policies, and it is therefore evident that ARPE's functions entail decision-making on politically contentious issues.

Likewise, AEP is an agency responsible for implementing politically sensitive policies.  The AEP is a public corporation whose seven-member board includes four people appointed by the Governor of Puerto Rico.  <u>Soto Padró</u> v. <u>Pub. Bldgs. Auth.</u>, 675 F.3d 1, 2 (1st Cir. 2012).  The AEP directs the preparation of plans for

-18-

all buildings and other facilities related to the provision of government services, such as schools and hospitals, and is empowered to contract with private entities to own, lease, finance, or repair such facilities. P.R. Laws Ann. tit. 22, § 903. In <u>Juarbe-Anqueira</u> v. <u>Arias</u>, 831 F.2d 11, 15 (1st Cir. 1987), we held that the AEP's mission "at least potentially . . . concern[ed] politically-charged issues" and granted AEP's Administrator qualified immunity on plaintiff's political discrimination claim. Since this decision, we have witnessed a number of developments at the AEP and can now firmly state that the agency's mission definitely, not merely potentially, concerns politically charged issues. Most significant of these developments is a 2006 amendment to the agency's enabling statute, P.R. Laws Ann. tit. 22, § 902, that mandated, as a matter of public policy, all governmental entities to "promote and support the contracting of the services of the [AEP] in order to fulfill the design, construction, remodeling, improvements, operations and maintenance needs of the structures needed for rendering [their] services."[7] As governmental organizations are now obligated to use the AEP services, the agency has absolute authority over the amount of money and resources that will be allocated for various repair, construction, and maintenance

---

[7] The amendment does not apply to governmental organizations which traditionally used their own employees or outside contractors to satisfy such needs.

projects. The political disposition of a given administration may thus greatly factor into the scope of such AEP projects.

As it is clear to us that both agencies' functions entail decision-making on politically charged issues, we move to the second prong of the test--that is, to evaluate whether O'Connell's particular responsibilities resembled those of a policy-maker. Jiménez-Fuentes v. Torres-Gaztambide, 807 F.2d 236, 242 (1st Cir. 1986) (citing Tomczak v. City of Chicago, 765 F.2d 633, 640 (7th Cir. 1985)). In making this determination, we look first to the position's job description rather than the employee's actual de facto responsibilities, finding this to be "the best, and sometimes [a] dispositive, source for determining the position's inherent functions." Roldán-Plumey, 115 F.3d at 62. We also consider the position's "relative pay, technical competence, power to control others, authority to speak in the name of policymakers, public perception, influence on programs, contact with elected officials, and responsiveness to partisan politics and political leaders." O'Connor v. Steeves, 994 F.2d 905, 910 (1st Cir. 1993) (internal citations omitted).

O'Connell's official job description at ARPE called for (1) performing duties related to "the direction, coordination, supervision and evaluation of the activities conducted in the various sections of the Human Resources office"; (2) ensuring "application and compliance of the laws and regulations related to

-20-

the merit system and to personnel administration"; and (3) preparing confidential reports and participating in the formulation and implementation of public policy regarding the administration of human resources in the agency.[8] As the AEP's Human Resources Director, she would have been in charge of "the enactment and implementation of the labor management policy, as well as the planning, coordination, and supervision of the programs and activities that are developed in the Human Resources and Labor Affairs Office."

According to both job descriptions, the Human Resources Director positions at the agencies have inherent policy-making, or at the very least, policy implementation authority. As noted by the district court, both positions are the highest human resources positions in their respective agencies, and both are trust positions which answer only to the agencies' administrators. Moreover, the job descriptions either explicitly state or implicitly suggest that the Human Resources Director has access to confidential information. Crucially, both positions are the conduit between the agencies' administrators and staff. Even if the Human Resources Director of either agency only relays policy from the administrator to the staff, she is still in a position to

_____

[8]     Defendants accompanied their summary judgment motion with copies of the official job descriptions of O'Connell's positions at ARPE and AEP. O'Connell raised no objection in connection with those exhibits.

implement policy, which the Supreme Court has noted is just as important as policymaking. <u>Branti</u> v. <u>Finkel</u>, 445 U.S. 507, 530 (1980). Moreover, the Human Resources Director of both agencies has authority to speak on behalf of policymakers, as well as influence to carry out the programs of their superiors. As such it appears evident that the second prong of the <u>Rosenberg</u> inquiry is satisfied, and political affiliation is an appropriate requirement for employment, since both Human Resources Director positions clearly resemble top level policymakers in their respective agencies.

O'Connell attempts to sidestep these realities by claiming that Law 7 limited her inherent responsibilities so as to strip her of discretion over any human resources policy-making or implementation. However, Law 7 only called for a two-year suspension of select responsibilities, temporarily preventing the Human Resources Director from taking certain personnel actions such as promotions, demotions, relocations and transfers. Law 7 did not eliminate or alter the Human Resources Director's job description. <u>See</u> P.R. Laws Ann. tit. 3, §§ 8802(a)(1)-(27). Even assuming that O'Connell's policy-related duties were limited by Law 7, this limitation would only be temporary, and her inherent duties would remain unchanged for the purposes of the <u>Rosenberg</u> analysis.

In all events, Law 7's major provisions pertain to human resources, and O'Connell was the employee charged with the

implementation of this law for ARPE's entire workforce (and would have been charged with Law 7's implementation at AEP). Such responsibility is in line with that of a high-level trust employee, whose political affiliation would be relevant to an agency's efficient functioning. Thus O'Connell's contentions miss the mark.[9]

To the extent that O'Connell claims that Law 7 stripped her of policy-making authority, yet maintains that Marerro discriminated against her because of their disagreement over how to implement Law 7 at ARPE, her arguments are self-defeating. In making these claims, O'Connell essentially admits that she retained some level of authority over how Law 7 was carried out, and that her use of this authority caused the conflict between her and Marrero. This only demonstrates that her position did in fact retain influence over policy implementation, regardless of any alleged limitations instituted by Law 7.

In sum, because there are no genuine disputes of material facts, and because the Human Resources Director positions at ARPE and AEP do not enjoy First Amendment protection, judgment in favor of Defendants in connection with O'Connell's freedom of association claim is proper as a matter of law.

---

[9] As the district court correctly pointed out, the fact that O'Connell pleads intra-party political discrimination does not alter this holding. See, e.g., Rodríguez-Rodríguez v. Muñoz-Muñoz, 808 F.2d 138, 145 (1st Cir. 1986).

## II. Conclusion

For the forgoing reasons, we affirm the district court's decisions at both the pleading stage and the summary judgment stage.