LYNCH, Circuit Judge.
Paul LePage, the Republican Governor of Maine, has had deep political disagreements with members of the Maine Legislature, particularly those who are Democrats—including the Speaker of the House, plaintiff Mark Eves. The Speaker, who is *136 term-limited, obtained a contract of employment with Good Will-Hinckley (“GWH”), a Maine nonprofit that operates the MeANS charter school for at-risk children, which is largely funded by biennial grants from the state. Whether to disburse that grant money to GWH was left by the legislature to the discretion of the governor.
Governor LePage conveyed to GWH his displeasure at the organization’s decision to hire the Speaker and threatened to withhold GWH’s discretionary funding when payment would ordinarily be due, assuming passage of Maine’s budget for Fiscal Years (“FY”) 2016 and 2017. Faced with the prospect of losing funding on which it depended, GWH terminated the Speaker’s employment contract.
The Speaker sued the Governor in federal court for damages and injunctive relief, asserting that the Governor, in violation of the U.S. Constitution, had retaliated against the Speaker’s exercise of his First Amendment rights. The Speaker also sought relief under state tort law. The U.S. District Court for the District of Maine dismissed all claims. Eves v. LePage, No. 1:15-cv-300-GZS, 2016 WL 1948869 (D. Me. May 3, 2016).
We affirm dismissal with prejudice of the Speaker’s federal claims, on qualified immunity grounds. As for his state claim, we vacate, and direct the district court to dismiss it without prejudice.
I.
Background
The issues in this case are ultimately issues of law, which receive de novo review. See United States v. Baird, 712 F.3d 623, 628 (1st Cir. 2013). Like the district court, we “assume[] the truth of the complaint’s well-pleaded facts and draw[ ] all reasonable inferences in [Speaker Eves’s] favor.” Eves, 2016 WL 1948869, at *1 (citing Schatz v. Republican State Leadership Comm., 669 F.3d 50, 55 (1st Cir. 2012)).
A. Maine’s Government and Budget Process
We begin with background information that is helpful in understanding the issues in this case.
Serving in the Maine Legislature is not a full-time job for most representatives. The legislature typically sits twice during each two-year session: once from December to June in year one, and then again from January to April in year two. See Me. Rev. Stat. Ann. (“M.R.S.A.”) tit. 3, § 2. A legislator’s salary is $24,056, spread across the two years, plus a $38 per diem, when the legislature is active, “for housing or mileage and tolls.” Eves, 2016 WL 1948869, at *2. Most legislators have at least one other source of income, often in the private sector. Id. In fact, legislators from both parties agree that “[njearly all legislators depend on a career outside of the State House to provide for their families.” Id. at *5 (relaying statement by Maine Senate President Mike Thibodeau, a Republican).
Maine’s biennial budget process starts when the Department of Administrative and Financial Services, after considering submissions from various agencies and policy committees, “prepare[s] and submit[s] ... a state budget document” to the governor. M.R.S.A. tit. 5, § 1662. The governor reviews the draft budget, alters it, and then sends it to the legislature before the statutory deadline “in January of the first regular legislative session.” Id. § 1666. The legislature must “enact a budget no later than 30 days prior to the date of adjournment prescribed” by law. Id. § 1666-A. The legislature’s budget then returns to the governor, who has line-item *137 veto power, permitting him to reduce “any dollar amount” in the budget. Me. Const, art. IV, pt. 3, § 2-A. The legislature can override any line-item veto with a simple majority of both the House and the Senate. Id. The governor can also veto the entire budget, like any other piece of legislation, in which cqsé a 2/3 majority of both the House and the Senate is necessary to override the veto. Id. art. IV, pt. 3, § 2.
The facts of this case, which occurred mostly in June 2015, arose in the midst of the biennial budget process and involved serious political conflict between Governor LePage and the legislature. In a press conference on May 29, 2015, the Governor stated that he.planned to veto “every bill sponsored by a Democrat” for the rest of his term in office “unless the Legislature agreed to support his plan to have a referendum vote on eliminating Maine’s income tax.” Eves, 2016 WL 1948869, at *4. The Governor did, in fact, veto ten bills on June 8, 2015, stating that he had done so purely because of their Democratic sponsorship. After the legislature passed a budget on June 17, 2015, the Governor issued sixty-four line-item vetoes, each of which the legislature overrode on June 18 and 19, 2015.
On June 29, 2015, the Governor vetoed the entire budget. The legislature also overrode that veto, on June 30, and enacted, the budget for FY2016 and FY2017 into law. That budget included discretionary funding for GWH.
B. Good Will-Hinckley and Speaker Eves
GWH is a private nonprofit organization, located in Fairfield, Maine, which aims to provide services to at-risk children throughout the state. Founded in 1889 as a “farm, school and home for needy boys,” GWH now has a broader mission and portfolio encompassing a “college step-up program,” a “Learning Center for youth with emotional or behavioral challenges,” a nutrition program, a library, and a museum. Id. at *2. The organization has long depended on both private donations and government grants.
Since'2009, GWH has been designated by Maine “to serve as the nonprofit charitable corporation with a public purpose to implement the Center of Excellence for At-risk Students.” Id. at *3; see M.R.S.A. tit. 20-A, § 6951. Fulfilling this responsibility, GWH opened a charter school in 2012, called the Maine Academy of Natural Sciences (“MeANS”). MeANS has its own board and its own principal; it also relies in large part on discretionary state funding.
The Maine state budget for FY2014 and FY2015—which covered the period from July 1, 2013 to June 30, 2015—allocated $1,060,000 in discretionary- funding to GWH for the purpose of operating MeANS. In that period of time, the Le-Page Administration chose to disburse all of that money. The proposed budget for FY2016 and FY2017, under debate in spring 2015, contained an identical appropriation of $1,060,000, to be paid to GWH in quarterly installments, as in previous years.
Glenn Cummings, formerly a Speaker of the Maine House of Representatives, resigned as president of GWH in September 2014, having served for approximately four years. GWH began searching for a successor, and plaintiff Mark Eves was one of nineteen applicants. Eves, Maine’s current Speaker, has served in that role since 2012 and as á representative since 2008. Because he is term-limited, see M.R.S.A. tit. 21-A, § 553(2), he must leave the House entirely in December 2016, when his fourth term expires. Speaker Eves also has fifteen years of professional experience as a marriage and family therapist. Since moving from California to Maine in 2003, the *138 Speaker has worked in that field, even while serving in the legislature.
GWH’s eight-member search committee interviewed Speaker Eves on April 24, 2015. He visited the campus as one of three finalists, and on April 30, the GWH Senior Leadership Team unanimously-recommended him as the best of the three. The Team’s memo “cited his ‘extensive clinical experience,’ his ‘balance of executive administration and fundraising experience,’ and his ‘leadership style and polished approach’ as reasons for their conclusion.” Eves, 2016 WL 1948869, at *3. After Speaker Eves interviewed with the full boards of GWH and MeANS on May 15, both voted unanimously to offer him the job of GWH President.
On June 5, 2015, Speaker Eves and GWH entered into a two-year employment agreement, which contained a “for-cause termination provision” and “no conditions or contingencies” related to any actions or funding decisions by the State. Id. at *4. GWH announced the Speaker as its new President on June 9.
C. ■ Governor LePage’s Intervention
On June 5, 2015, Governor LePage learned that GWH had decided to hire Speaker Eves. The Governor promptly called GWH’s Interim President, stating “that he was extremely upset” about the news and “us[ing] profanity to describe [Speaker Eves] and his work.” Id. That same day or “soon after,” LePage sent a handwritten note to GWH’s Board Chair, which “referred very negatively to Eves” and called the Speaker a “hack.” Id. The Board Chair’s belief, after reading the note, was “that GWH would lose $1,060,000 in state funding if it retained Eves as its new President.” Id.
On June 8, Governor LePage sent a public letter to the Board Chairs of GWH and MeANS, “urging that they reconsider,” Id. The letter characterized Speaker Eves as “a longtime opponent of public charter schools” who had fought against “every effort to reform Maine’s government.” Id. The GWH Board, “which includes people of various political affiliations,” discussed the letter and “agreed that their selection of Speaker Eves [had been] well-supported and ... not based on political considerations.” Id.
Also on June 8, the Governor received a call from Gregory Powell, the Board Chair of the Harold Alfond Foundation (“the Foundation”), who was responding to a June 5 voicemail from the Governor. During their conversation, Powell learned that the Governor was “withdrawing all support, including financial support, from GWH as long as Eves remained as President of the organization.” Id. Responding to that news, Powell sent a letter to GWH’s Board on June 18, warning them that the Foundation had “serious con-cernís] ... regarding [GWH’s] future financial viability” if the Governor were to follow through on his threat to withhold the $1,060,000 of state funding. Id. Those concerns, he further warned, made the Foundation uneasy about committing to a $2,750,000 grant that the Foundation had been planning to give to GWH.
On or about June 9, Governor LePage told the Acting Commissioner of the Department of Education not to send any more payments to GWH that were not required by law. The Commissioner duly froze $132,500 in discretionary funds scheduled to be sent to GWH for the next quarter (beginning on July 1). At that point, having passed no new budget, the legislature had not yet appropriated any quarterly payments for GWH beyond what GWH had already received.
The lawyers representing Speaker Eves and Governor LePage, respectively, con *139 ferred on June 22. The Speaker’s lawyer asked the Governor to withdraw his threats, but the Governor refused to change his stance. He also took no further steps “to reduce or eliminate the $1,060,000 in discretionary funds allotted in the proposed state budget for GWH.” Id. at *5.
After that conversation between the attorneys, GWH terminated Speaker Eves’s employment contract on June 24, one week before his planned July 1 start date. The Speaker immediately stated publicly that “his firing was caused by LePage’s threat to withhold funding.” Id. Several GWH leaders emailed Speaker Eves, opining that he “would have been a wonderful fit” for the organization. Id. Months later, on October 15, GWH’s Board Chair stated in a legislative hearing that Eves would not have been fired but for Governor LePage’s intervention. Some of the Speaker’s colleagues in the legislature also spoke out. State Senate President Mike Thibodeau, a Republican, publicly called himself “very saddened by this situation, and shocked by what is being alleged. Nearly all legislators depend on a career outside of the State House to provide for their families.” Id.
Initially, Governor LePage declined to confirm or deny any interference with GWH’s decision-making process. However, on June 29, local reporters interviewed the Governor and asked whether he had “threatened to withhold money” from GWH, and he responded:
Yeah, I did! If I could, I would! Absolutely; why wouldn’t I? Tell me wliy I wouldn’t take the taxpayer money, to prevent somebody- to go into a school and destroy it. Because his heart’s not into doing the right thing for Maine people.
In a radio address on July 7, the Governor further explained:
[The Speaker] worked his entire political career to oppose and threaten charter schools in Maine. He is' the mouthpiece for the Maine Education Association. Giving taxpayers’ money to a person who has fought so hard against charter schools would be unconscionable.
... [F]ormer legislators used their political positions to land cushy, high-paying jobs in which they were trusted to use taxpayer money to improve the lives of Mainers. They abused that trust and had ...to face the consequences of their actions. The same is true of Mark Eves.
And in another interview, on July 30, the Governor called Speaker Eves “a plant by the unions to destroy charter schools.” The Governor drew an analogy: “One time I stepped in ... when a man was beating his wife. ... Should-1 have stepped in? Legally, no. But I did. And I’m not embarrassed about doing it.”
D. U.S. District Court Proceedings
Speaker Eves filed this lawsuit on July 30, 2015 and then filed a First Amended Complaint on December 18, 2015. Governor LePage moved to dismiss on January 5, 2016, arguing that the complaint failed to state a claim, see Fed. R. Civ. P. 12(b)(6), and that the subject matter of the lawsuit was “a political dispute that does not belong in court.” On April 13, 2016, the day of oral argument on the Governor’s 12(b)(6) motion, the Speaker was granted leave (without opposition) to file a Second Amended Complaint.
The Second Amended Complaint contained five claims against Governor.Le-Page: four federal law claims under 42 U.S.C. § 1983 for violations of Speaker Eves’s rights to political affiliation, free speech, freedom of association, and procedural due process, as well as a fifth claim under state law for intentional interference with contract. As relief, the Speaker re *140 quested (1) a declaratory judgment; (2) an injunction compelling Governor LePage to “permanently withdraw his illegal threat” to GWH and “cease using his authority to illegally retaliate against Eves or private organizations that are prospective employers or employers of Eves”; and (3) damages.
On May 3, 2016, the district court issued an opinion, which granted Governor Le-Page’s motion to dismiss. Eves, 2016 WL 1948869, at *1. The court entered judgment for the Governor the next day, and Speaker Eves filed a notice of appeal that same day.
II.
Damages Claims
Speaker Eves continues to seek damages under § 1983, for alleged violations of his First Amendment rights of political affiliation and freedom of association, as well as injunctive relief.[1] Governor LePage argues in response that either absolute or qualified immunity shields him from any personal liability for damages under § 1983, and that there is no legal basis for injunctive relief.
The facts and the parties’ arguments touch upon a host of nuanced First Amendment questions. We leave them for another day and affirm dismissal of the damages claims on narrow grounds: Governor LePage is entitled to qualified immunity, because Speaker Eves has not shown that it was beyond debate that the Governor’s discretionary actions amounted to unconstitutional retaliation against the Speaker.[2] See Ashcroft v. al-Kidd, 563 U.S. 731, 741, 131 S.Ct. 2074, 179 L.Ed.2d 1149 (2011).
A. Qualified Immunity Framework
Qualified immunity analysis, which forecloses Speaker Eves’s damages claims, encompasses two inquiries. The first is “whether the facts alleged or shown by the plaintiff make out a violation of a constitutional right,” and the second is “whether the right was ‘clearly established’ at the time of the defendant’s alleged violation.” Stamps v. Town of Framingham, 813 F.3d 27, 34 (1st Cir. 2016) (quoting Mlodzinski v. Lewis, 648 F.3d 24, 32 (1st Cir. 2011)). The second prong, in turn, contains two subparts: “(a) whether the legal contours of the right in question were sufficiently clear that a reasonable [official] would have understood that what he was doing violated the right, and (b) whether in the particular factual context of the case, a reasonable [official] would have understood that his conduct violated the right.” Id. (quoting Mlodzinski, 648 F.3d at 32-33). Qualified immunity ultimately shields “all but the plainly incompetent or *141 those who knowingly violate the law.” Mullenix v. Luna, — U.S. -, 136 S.Ct. 305, 308, 193 L.Ed.2d 255 (2015) (per curiam) (quoting Malley v. Briggs, 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986)).
We jump directly to the second prong[3] and ask whether Speaker Eves' has met his burden ■ to show that Governor LePage violated “clearly established” federal law. See, e.g., Lopera v. Town of Coventry, 640 F.3d 388, 396 (1st Cir. 2011) (exercising the Pearson option and beginning with prong two). In doing so, we heed the Supreme Court’s oft-repeated warning “not to define clearly established law at a high level of generality.” E.g., Mullenix, 136 S.Ct. at 308; Plumhoff v. Rickard, — U.S. -, 134 S.Ct. 2012, 2023, 188 L.Ed.2d 1056 (2014); al-Kidd, 563 U.S. at 742, 131 S.Ct. 2074; Stamps, 813 F.3d at 39. Although Speaker Eves need not produce “a case directly on point” to overcome Governor LePage’s qualified immunity defense, “existing precedent must have placed the ... constitutional question beyond debate.” al-Kidd, 563 U.S. at 741, 131 S.Ct. 2074.
B. Analysis of Qualified Immunity Defense
The specific question we must consider is whether a reasonable governor objectively could have been uncertain about either the contours of the legal landscape or the constitutionality of this particular series of actions. See Stamps, 813 F.3d at 34. Speaker Eves bears the burden of proof, see Rivera-Corraliza v. Morales, 794 F.3d 208, 215, 219 (1st Cir. 2015), and he must place it beyond debate that Governor Le-Page unlawfully infringed upon the Speaker’s First Amendment interests.
Speaker Eves has not done so. On these facts, a reasonable governor could have been uncertain whether the attempts to influence GWH would infringe upon the Speaker’s constitutional rights—even if the attempts were successful. No Supreme Court case or circuit case clearly forbade Governor LePage from informing a potential recipient of a government grant of his intention to exercise funding discretion, afforded him by the state legislature, if the potential recipient chose to persist with a course of action that the Governor disfavored. The decision that actually affected the Speaker was made by third parties— and private parties, at that. See Zaloga v. Borough of Moosic, No. 15-2723, 841 F.3d 170, 177, 2016 WL 6156003, at *5 (3d Cir. Oct. 24, 2016) (affording qualified immunity to elected official, for lack of clearly established law, in part because “it has never been established that a governmental official who does not himself retaliate but instead pressures another individual to retaliate ... can be held personally liable”).
Speaker Eves articulates the alleged § 1983 violation as Governor LePage “us[ing] his control over public funds to coercé a private employer into firing the leader of the opposing political party in retaliation for that leader’s exercise of First Amendment rights.” At the highest level of generality, denying a governmental benefit “on a basis that infringes [a plaintiffs] constitutionally protected interests” amounts to a cognizable § 1983 claim. Perry v. Sindermann, 408 U.S. 593, 597, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972).
In our view, however, Speaker Eves “cannot plausibly urge that [Gover *142 nor LePage] had no valid ... reason” for interfering with GWH’s hiring decisions, in the specific context of this case. Wood v. Moss, — U.S. -, 134 S.Ct. 2056, 2070, 188 L.Ed.2d 1039 (2014). The qualified immunity test for government officials is objective, rather than subjective; we focus on what a. reasonable governor could have believed,, not on allegations about what Governor LePage actually believed. See Messerschmidt v. Millender, 565 U.S. 535, 132 S.Ct. 1235, 1245, 182 L.Ed.2d 47 (2012); Harlow v. Fitzgerald, 457 U.S. 800, 817-19, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982) (holding that mere allegations of bad faith or pretext do not suffice without allegations of objectively and clearly wrongful conduct, and thereby abrogating Scheuer v. Rhodes, 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974)); Matalon v. Hynnes, 806 F.3d 627, 633 (1st Cir. 2015); Floyd v. Farrell, 765 F.2d 1, 4-6 (1st Cir. 1985). The Governor reasonably could.have believed that his threats and criticisms pertained to subjects within his political ken and broad discretionary authority as governor, and that he was acting lawfully by criticizing and commenting upon GWH’s plan to employ a president with a track record of opposition to Governor Le-Page’s priorities with respect to education policy.
To avoid this conclusion, Speaker Eves must identify “existing precedent ... [that] placed the statutory or constitutional question beyond -debate.” Taylor v. Barkes, — U.S. -, 135 S.Ct. 2042, 2044, 192 L.Ed.2d 78 (2015) (per curiam) (quoting al-Kidd, 563 U.S. at 741, 131 S.Ct. 2074). He cites several circuit cases and says that they put Governor LePage on notice that the Governor’s communications with a third party—that is, GWH—violated the Speaker’s rights. Of the cases the Speaker identifies, we discuss three, each of which involved a governor as defendant: Mihos v. Swift, 358 F.3d 91 (1st Cir. 2004); El Dia, Inc. v. Rossello, 165 F.3d 106 (1st Cir. 1999); and Blankenship v. Manchin, 471 F.3d 523 (4th Cir. 2006). None of the three placed it “beyond debate,” in June 2015, that the Governor’s actions violated the Speaker’s constitutional rights.
The decision in Mihos does not support denial of qualified immunity for at least two reasons. First, Mihos is factually dissimilar: the court- denied pretrial .qualified immunity to a governor who had directly terminated a plaintiffs appointment to a public-service position with a fixed term. In 1999, the Governor of Massachusetts, Paul Cellucci, reappointed plaintiff Christy Mihos to the Massachusetts Turnpike Authority, .a “public instrumentality,” for an eight-year term to expire in 2007. Mihos, 358 F.3d at 96. In 2001, Mihos and a colleague voted to delay an increase in Turnpike tolls beyond the date preferred by Cellucci’s successor, Governor Swift. Id. at 96-97. Governor Swift responded by removing them from office, citing “the fiscal irresponsibility of their votes” on the toll increase. Id. at 97. The Mihos court “articulate[d] the First Amendment right at stake ... as the right of a public official to vote on a matter of public concern ... without suffering retaliation from the appointing authority for reasons unrelated to legitimate governmental interests,” and found that the right was clearly established. Id. at 109.
Mihos’s precise holding, however, was that “[n]o reasonable public official could have failed to realize that a member of a public instrumentality cannot be terminated on such grounds for voting on matters of public concern within his authority.” Id. at 110. Because Governor LePage did not directly terminate Speaker Eves’s employment, but rather (taking the Speaker’s allegations as true) used discretionary state funding as leverage to influence a private organization, Mihos did not indisputably *143 put Governor LePagé on notice that his particular conduct amounted to clearly unlawful retaliation in violation of the Speaker’s constitutional-rights.[4]
Even if Mihos were on all fours with this case, it would fail to undermine Governor LePage’s qualified immunity defense for a second reason: the Governor could reasonably have concluded that Mihos’s reasoning had beén undermined by Garcetti v. Ceballos, 547 U.S. 410, 126 S.Ct. 1951, 164 L.Ed.2d 689 (2006). Mihos applied the familiar Pickering test and’ weighed Mihos’s First Amendment interests against “the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.” Mihos, 358 F.3d at 103 (quoting Pickering v. Bd. of Educ., 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968)). But two years later, the Supreme Court squarely rejected “the notion that the First Amendment shields from discipline the expressions employees make pursuant to their professional duties.” Garcetti, 547 U.S. at 426, 126 S.Ct. 1951. That rejected notion is central to Mihos’s reasoning.
Other courts, in granting qualified immunity, have observed that Garcetti' has caused “substantial disagreement” among lower courts with respect to the scope of retaliation claims by public employees. Werkheiser v. Pocono Twp., 780 F.3d 172, 180 (3d Cir. 2015). The Third Circuit, for example, granted qualified immunity last year to two elected officials who were subjected to a retaliation lawsuit by a third elected official, plaintiff Werkheiser, after the defendants denied Werkheiser reappointment to a position in local government. Id. at 174-75. The court held that it was not clearly established whether elected officials—like Werkheiser, or someone like Speaker Eves in the instant case—are “public employees,” nor what speech by elected officials should be categorized as “pursuant to their official duties.” See id. at 177-81 (collecting cases and discussing “the unsettled nature of the law,” after Garcetti, “amongst both the circuit courts and the district courts”). Because of the uncertainty in this doctrinal area in the wake of Garcetti, a reasonable official ih Governor LePage’s position could also have viewed Mihos as a case of uncertain precedential value.[5]
In El Dia, the issue was whether the Governor of Puerto Rico, Pedro Ros-sello, was entitled to qualified immunity for his alleged termination of advertising *144 contracts between government agencies and the plaintiff newspaper; which had “published a series of articles alleging patterns of fraud and waste in the Rossello Administration.” 165 F.3d at 108. This court acknowledged that “[cjlearly established law prohibits the government from conditioning the revocation of benefits on a basis that infringes constitutionally protected interests.” Id. at 110 (citing Perry, 408 U.S. at 597, 92 S.Ct. 2694). But in El Dia, “the very action in question ha[d] previously been held unlawful” by decisions in the Third and Fifth Circuits. Id. (quoting Anderson v. Creighton, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)). Although El Dia involved alleged retaliation by means of withholding discretionary benefits, and not by means of affirmative regulatory action, the case does not speak directly to the actions Governor Le-Page took and therefore did not put him on notice that his conduct was unlawful. Even more importantly, El Dia involved intrusion by a governor into the operations of a newspaper and the freedom of the press—factors not present here.[6]
By way of conclusion, we reiterate that we have no need to address the constitutionality vel non of Governor LePage’s conduct. We hold only that an official in the Governor’s position reasonably could have been uncertain whether this particular series of actions, falling within broad discretion given by the legislature and pertaining to funds not yet formally appropriated, amounted to a violation of Speaker Eves’s constitutional rights. Our holding is consistent with a long line of Supreme Court cases applying immunity as a shield for public officials who must exercise broad discretion in the discharge of their public duties. See, e.g., Mullenix, 136 S.Ct. at 310-12; Wood, 134 S.Ct. at 2067 (discussing broad discretion inherent to Secret Service roles); al-Kidd, 563 U.S. at 741-43, 131 S.Ct. 2074 (affording qualified immunity to former U.S. Attorney General); Harlow, 457 U.S. at 815-19, 102 S.Ct. 2727; Nixon v. Fitzgerald, 457 U.S. 731, 749-58, 102 S.Ct. 2690, 73 L.Ed.2d 349 (1982) (affording absolute immunity to former U.S. President, as “a functionally mandated incident of the President’s unique office”).
III.
Injunctive and Declaratory Relief
Speaker Eves seeks, in addition to damages, injunctive relief preventing Governor LePage from threatening GWH again or “using his authority” to interfere with the Speaker’s employment in the private sector. Speaker Eves also seeks a declaratory judgment and an order compelling the Governor to complete “effective civil rights training.” Qualified immunity, of course, cannot shield the Governor from these requests for equitable relief. See Battista v. Clarke, 645 F.3d 449, 452 (1st Cir. 2011).
The district court suggested that Speaker Eves’s equitable claims are moot. *145 Eves, 2016 WL 1948869, at *21. We agree that the request for injunctive relief is moot insofar as it relates to ongoing interference with GWH. The Speaker conceded at oral argument, as a factual matter, that he has obtained a new private-sector job and that GWH has a new president. There appears to be “no ongoing conduct left for the court to enjoin.” ACLU of Mass. v. U.S. Conference of Catholic Bishops, 705 F.3d 44, 53 (1st Cir. 2013).
As to Speaker Eves’s. other requests for prospective injunctive relief, the district court feared that the Speaker’s desired injunction would have “extraordinary” breadth and-would attempt to “compel [Governor LePage] to conform his behavior to some preferred standard of decorum.” Eves, 2016 WL 1948869, at *22. We perceive the same problem, but it strikes us as sounding more in standing doctrine than in mootness. The Governor, as the party invoking mootness, bears a “formidable burden” in attempting to show that his “allegedly wrongful behavior could not reasonably be expected to recur.” Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc., 528 U.S. 167, 190, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000). Even so, projected future harm can be “too speculative to support standing,” even if it is “not too speculative to overcome mootness.” Id.
Speaker Eves has not “credibly allege[d] ... a realistic threat” of future retaliation from Governor LePage. Id. And the Supreme Court has been reluctant to afford private citizens standing to enjoin hypothetical future government conduct. See, e.g., City of Los Angeles v. Lyons, 461 U.S. 95, 105-06, 110, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983) (finding no standing for plaintiff seeking to enjoin police department’s future use of choke holds, because he had failed to “indicate why [he] might be realistically threatened” by the use of such choke holds in the future). The Speaker’s “subjective fears ... are generic, speculative, and- fail to demonstrate a ‘real and immediate threat’ of likely future violations.” Asociación de Periodistas de P.R. v. Mueller, 680 F.3d 70, 85 (1st Cir. 2012) (quoting Lyons, 461 U.S. at 105, 103 S.Ct. 1660).
There is another reason to affirm dismissal of these claims: Speaker Eves has not pleaded facts sufficient to prove his entitlement to an injunction. He has not demonstrated that any injury he has suffered was “irreparable,” nor that “the public interest would not be disserved by a permanent injunction.” eBay Inc. v. MercExchange, L.L.C., 547 U.S. 388, 391, 126 S.Ct. 1837, 164 L.Ed.2d 641 (2006). “The decision to grant or deny permanent in-junctive relief is an act of equitable discretion by the district court,” id. and the district court did not abuse its discretion in this instance.
IV.
State Law Claim
Speaker Eves also raises a pendent state claim under the Maine Tort Claims Act (“MTCA”) for intentional interference with contract. Governor LePage argues that he is immune, as a matter of state law, because Maine grants absolute personal immunity to “employees of governmental entities” for “[performing or failing to perform any discretionary function or duty, whether or not the discretion is abused.” M.R.S.A. tit. 14, § 8111(1), (1)(C).
Having properly dismissed the § 1983 claims on which federal jurisdiction relied, the district court exercised supplemental jurisdiction and dismissed the pendent MTCA claim on immunity grounds. In our view, the district court should have declined to exercise supplemental jurisdiction.
*146 A district court “may decline to exercise supplemental jurisdiction” if the court “has dismissed all claims over which it has original jurisdiction.” 28 U.S.C. § 1367(c)(3). The Supreme Court has explained that district courts must weigh several factors when deciding whether to exercise jurisdiction over pendent state law claims: assuming jurisdiction might promote “judicial economy” and “convenience,” but declining jurisdiction might promote “comity” or afford the parties a “surer-footed reading of applicable law” from state courts. United Mine Workers of Am. v. Gibbs, 383 U.S. 715, 726, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966).
Here, the balance of Gibbs factors tips heavily toward a federal court declining to exercise its supplemental jurisdiction. Admittedly, the state law claim does not predominate, in Speaker Eves’s lawsuit, see id. at 727-28, 86 S.Ct. 1130, and his claims all “derive from a common nucleus of operative fact,” id. at 725, 86 S.Ct. 1130. Still, in this circuit, it is well settled “that in the usual case in which all federal-law claims are eliminated before trial, the balance of factors [from Gibbs] will point toward declining to exercise jurisdiction over the remaining state-law claims.” Rivera-Díaz v. Humana Ins. of P.R., Inc., 748 F.3d 387, 392 (1st Cir. 2014) (quoting Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 350 n.7, 108 S.Ct. 614, 98 L.Ed.2d 720 (1988)). Most importantly, comity concerns loom especially large when a case broaches questions about the authority of a state’s governor and the separation of powers within the state government. We take no position on whether the district court’s interpretation of Maine law was correct; for the foregoing reasons, the matter is best left to the Maine courts.
To that end, the district court’s dismissal of Speaker Eves’s MTCA claim on the merits is vacated. We remand with instructions to dismiss the claim without prejudice.
V.
Conclusion
The district court’s judgment is affirmed with respect to the dismissal of Speaker Eves’s federal claims, and vacated with respect to the dismissal with prejudice of Speaker Eves’s MTCA claim, which is remanded to the district court for a dismissal without prejudice. No costs are awarded.

. On appeal, Speaker Eves has abandoned his § 1983 damages claims arising from free speech and due process violations. He continues to press those alleged violations in his pursuit of equitable relief.

. Because we affirm the district court's judgment on these qualified immunity grounds, we express no view on whether Governor LePage could reasonably have believed that his own First Amendment rights and the government speech doctrine protected these communications from suit. See Eves, 2016 WL 1948869, at *13-15; see also Walker v. Texas Div., Sons of Confederate Veterans, Inc., — U.S. -, 135 S.Ct. 2239, 192 L.Ed.2d 274 (2015); Pleasant Grove City v. Summum, 555 U.S. 460, 129 S.Ct. 1125, 172 L.Ed.2d 853 (2009). We also do not reach the Governor’s absolute immunity defense, or the question of whether Speaker Eves's position as President of GWH, an organization receiving state funding and overseeing Maine’s first public charter school, made him a "policymaker” who could be terminated without offending the First Amendment. See, e.g., O'Connell v. Marrero-Recio, 724 F.3d 117, 126 (1st Cir. 2013); Prisma Zona Exploratoria de P.R., Inc. v. Calderon, 310 F.3d 1, 7-8 (1st Cir. 2002).

. In Pearson v. Callahan, the Supreme Court instructed lower courts "to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances of the particular case at hand.” 555 U.S. 223, 236, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009).

. The Speaker also cites Blankenship, which also involved threats of adverse regulatory action directly against the plaintiff. See Blankenship, 471 F.3d 523. The Fourth Circuit denied immunity at the 12(b)(6) stage to Joe Manchin III, then Governor of West Virginia, who had allegedly reacted to- political criticism from plaintiff Blankenship by directing state regulators to apply "tougher scrutiny” to Blankenship’s business affairs and work sites. Id. at 525-26. The case is distinguishable for that reason,

. We acknowledge that Garcetti addresses mostly free speech claims, as opposed to political affiliation or freedom of association claims: But Garcetti’s concerns about the "delicate balancing" of public-employee rights and government flexibility, as well as its anxiety about “judicial intervention in the conduct of governmental operations,” are not applicable only in the free speech context. 547 U.S. at 423, 126 S.Ct. 1951. Those concerns, for example, also underlie the so-called policymaker exception: the principle that political affiliation, for certain public employees, is an "appropriate requirement for continued tenure.” O’Connell, 724 F.3d at 126 (quoting Rosenberg v. City of Everett, 328 F.3d 12, 18 (1st Cir, 2003)); see also Maymí v. P.R, Ports Auth., 515 F.3d 20, 27 (1st Cir. 2008) (recognizing that both an official’s political affiliation and her "substantive views on agency matters” are permissible justifications for firing or demotion when she occupies a policy-making role (citing Flynn v. City of Boston, 140 F.3d 42, 47 (1st Cir. 1998))).

. Speaker Eves cites several other decisions from our sister circuits. Those cases also fail to render it beyond debate that Governor Le-Page’s conduct violated the Speaker’s First Amendment rights. In the absence of "controlling authority”'from the Supreme Court or this court, the Speaker’s burden is to identify "a consensus of cases of persuasive authority” from our sister circuits. Wilson v. Layne, 526 U.S. 603, 617, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999); see also El Dia, 165 F.3d at 110 n.3 (recognizing that, ”[a]mong other factors, the location and level of the precedent,” as well as its age, are important factors in a qualified immunity analysis). Speaker Eves has not met that burden: the out-of-circuit cases that are not factually distinguishable predate key Supreme Court precedent or are inconsistent with intervening precedent from our circuit. Even collectively, these cases fall short of a "consensus.”